## Commonwealth *v.* Mimms, Appellant.

Submitted March 28, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Burton Spear,* and *Renninger, Spear & Kupits,* for appellant.

*David Richman, James J. Wilson,* and *Steven H. Goldblatt,* Assistant District Attorneys, *Abraham J. Gafni,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellee.

OPINION BY WATKINS, P. J., March 31, 1975:

This is an appeal from the judgment of sentence of the Court of Common Pleas of Philadelphia County, Criminal Division, by the defendant-appellant, Harry Mimms, after conviction by a jury of violation of the Uniform Firearms Act and Carrying a Concealed Deadly Weapon.

Post-trial motions were denied and the appellant was sentenced to 1½ to 3 years imprisonment.

The case was commenced by arrest and complaint on September 7, 1970, and a preliminary hearing was subsequently held on September 16, 1970. Since the maximum penalty which could be imposed on Carrying a Concealed Deadly Weapon and violation of the Uniform Firearms Act charges was four (4) years and the jurisdiction of the Municipal Court, at that time, was limited to cases punishable by no more than two (2) years, the case fell within the jurisdiction of the Court of Common Pleas. So accordingly, the case against the appellant was presented to the Grand Jury where indictments were returned. Pennsylvania Constitution, Article 5, Schedule 16 (r) (iii).

As amended by Act No. 45 of 1971 Sessions, affirmed July 14, 1971, Article 5 and its schedule were amended to broaden the jurisdiction of the Municipal Court to hear cases where the maximum sentence was five (5) years or less. 1969, October 17, P.L. 259, §18, as amended 1971, July 14, P.L. 224, No. 45, §1, 17 P.S. §711.18.

On October 19, 1971, the President Judge of the Court of Common Pleas (a) gave the Municipal Court exclusive jurisdiction over a certain class of cases where the maximum possible sentence was five (5) years or less and (b) established by regulation procedure whereby a case could be certified from the Municipal Court for trial initially in Common Pleas. General Court Regulation No. 71-16. There is nothing in the July, 1971 Amendment or in the Court regulation that would permit any case to be heard in Municipal Court in which a Grand Jury indictment had been returned based on the original jurisdiction.

At trial, two police officers testified that on or about 9 A.M. on September 7, 1970, while on patrol, they observed the appellant driving west on Baltimore Avenue with an expired license plate. The officers stopped the

car to issue a traffic summons. The appellant was asked to step out of the automobile and produce his owner's card and operator's license. The officers noticed a large bulge on the appellant's hip under his sport jacket. The officer feared a concealed deadly weapon and frisked the appellant and took from his waistband a .38 caliber revolver with five live rounds. The other occupant of the automobile was also frisked and a .32 caliber revolver was removed from his person.

The appellant contends that the search of his person and the seizure of the revolver violated his contitutional rights.

The Supreme Court of the United States in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), at page 27 held:

"Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. (Citations omitted) And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate, and unparticularized suspicion or 'hunch', but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

What the Court was actually saying was not "what a reasonably prudent man in the circumstances would be warranted in the belief that his safety . . . is in danger", but rather, what a reasonably prudent police officer would

be warranted to believe, otherwise police experience referred to in the above citation would have no bearing. Either test could be properly applied in the instant case.

As a general proposition the arrest of the driver of an automobile for an ordinary traffic offense does not, without more, permit a warrantless search of an automobile. *Commonwealth v. Dussell*, 439 Pa. 392, 266 A. 2d 659 (1970), but when, as in the instant case, a police officer in the performance of his duty stops a car to enforce a traffic violation for failure to have a current license tag, and when requesting the driver to step out of the car and exhibit his owner's card and driver's license, he becomes aware of a situation that may prove dangerous to his person, his right to frisk to remove the danger, arises.

The Commonwealth concedes that the only reason the car was stopped was the absence of a current license plate. However, the subsequent search and frisk of the person was not the subject of an ill-founded hunch or whimsical on the part of the officer as the appellant contends, nor did the search constitute harrassment in any sense. The narrow basis of the frisk or search was strictly and solely for the officers' own protection. Such searches are encouraged by the Supreme Court of the United States for the protection of law enforcement officers. *Terry v. Ohio*, supra; *Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972).

Frightening statistics form the foundation for the authorization of self-protective searches by police officers:

> "Figures reported by the Federal Bureau of Investigation indicate that 125 policemen were murdered in 1971, with all but five of them having been killed by gunshot wounds. Federal Bureau of Investigation Law Enforcement Bulletin, Feb., 1972, p. 33. According to one study, approximately 30% of police shootings occurred when a police officer approached

a suspect seated in an automobile. Bristo, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L.C. & P.S. 93 (1963)." Id. at 148-149, n. 3.

The appellant contends that a question asked concerning his religious background was fundamental error. This occurred on cross-examination and was as follows:

"Q.  Tell me, are you a good friend of Harry Mimms?

"A.  I am an acquaintance of him, I know him.

"Q.  You know him very well would you say?

"A.  Yes, sir.

"Q.  Are you both Muslims?

"A.  Sir?

"Objection: Sir, I move for withdrawal of a juror.

"THE COURT:  Overruled.

"Q.  Are you both Muslims?

"A.  Yes, sir.

"Q.  In other words, when you say 'Muslims', followers of the Islam faith is that right?

"A.  Yes."

Clayton Morrison who so testified was the only witness called by the appellant on his behalf. This questioning was designed to show bias in favor of the appellant in that they were close friends and members of the same religious sect. The defendant took advantage of this fact to have the point made that adherents of the sect have an obligation to testify truthfully. The contention is without merit.

The charge was as a whole fair and impartial P.L.E., Criminal Law, §721.7. The Court reviewed the testimony on both sides and the appellant complains about an isolated statement concerning credibility of the police. But the Court went on to say: "On the other hand, you may say that they had no reason, that they just wanted to say that he did it. Or they found two guns in the car and they thought it was easier to say that he had a gun on him than to say they found them under the dashboard. In any event, members of the jury, it is for you to say. And

you just say by unanimous verdict." The appellant contended that the gun was found in the car, while the police testified that they took the gun from his person. It is evident that the jury believed the testimony of the Commonwealth.

Judgment of sentence affirmed.

DISSENTING OPINION BY HOFFMAN, J.:

Appellant contends that the lower court erred in allowing a defense witness to testify, on cross-examination, that both he and appellant were of the Muslim faith.

At approximately 9 a.m. on September 7, 1970, Philadelphia police officers John Kurtz and Lester Milby observed appellant driving west on Baltimore Avenue in an automobile bearing an expired license tag. The officers stopped the car in order to issue a summons. Officer Kurtz asked the appellant to step out of his car. Officer Kurtz testified that when appellant stepped out of the car, he noticed a large bulge on appellant's hip under his jacket. He then frisked appellant, and seized a loaded .38 caliber revolver from appellant's waistband. Officer Milby testified that he then frisked appellant's passenger, Clayton Morrison, and found a .32 caliber revolver.[1]

At trial in the Philadelphia Common Pleas Court, both appellant and Morrison testified as defense witnesses, and maintained that Morrison had brought both revolvers into the car. Morrison testified that the .38 revolver had been under the car seat, and not on appellant's person, at the time of the stop.

On March 15, 1972, a jury found appellant guilty of a violation of the Uniform Firearms Act[2] and carrying a

---

1. Prior to appellant's trial, Morrison had pleaded guilty to charges of violation of the Uniform Firearms Act and carrying a concealed deadly weapon.

2. Act of June 24, 1939, P.L. 872, §628, as amended; former 18 P.S. §4628, repealed by the Act of December 6, 1972, P.L. 1482, No. 334, §5(a), effective June 6, 1973; substantially reenacted by

concealed deadly weapon.[3] Post-trial motions were denied; this appeal followed.

On cross-examination the Assistant District Attorney was allowed to ask Morrison the following questions:

"Q. Tell me, are you a good friend of Harry Mimms?

"A. Yes, sir.

"Q. You know him very well, would you say?

"A. Yes, sir.

"Q. Are you both Muslims?

"A. Sir?

[Counsel for appellant]:

"Objection, sir. I move for withdrawal of a juror.

"THE COURT: Overruled.

[By the Assistant District Attorney]:

"Q. Are you both Muslims?

"A. Yes, sir.

"Q. In other words, when you say 'Muslims,' followers of the Islam faith, is that right?

"A. Yes."

In Pennsylvania, the legislature has specifically provided that "[n]o witness shall be questioned, in any judicial proceeding, concerning his religious belief; nor shall any evidence be heard upon the subject, for the purpose of affecting either his competency or credibility." Act of April 23, 1909, P.L. 140, §3, 28 P.S. §313.[4] Here, the

---

the Act of December 6, 1972, supra, §1, 18 Pa.C.S. §§6101 through 6119.

3. Act of June 24, 1939, supra, n. 2, §416, as most recently amended February 25, 1972, P.L. 79, No. 27, §1, 18 P.S. §4416; repealed by the Act of December 6, 1972, supra, n. 2, §5(a), effective June 6, 1973; superseded by the Act of December 6, 1972, supra n. 2, §1, 18 Pa.C.S. §§907, 908.

4. Pennsylvania's statute had been described as "a model of clarity" which "settles most of the questions left unsettled in other states . . ." McCormick, *Handbook of the Law of Evidence*, §48 at 102 (2d ed. E. Cleary 1972). The various state statutes are collected and discussed in 3A Wigmore, *Evidence* §936 (Chadbourn rev. 1970).

Commonwealth was clearly using the common religious affiliation of appellant and Morrison as a means of impeaching Morrison's credibility. Indeed, the lower court states in its opinion that the testimony was introduced "to show the witness' relationship with the defendant *and put his credibility in issue.*" (Emphasis supplied.)

Evidence concerning the religious beliefs of witnesses can be admitted only where its relevance to the issues of the case is so great as to outweigh any possibility of prejudice.[5] Thus, in *McKim v. Philadelphia Transportation Co.,* 364 Pa. 237, 72 A. 2d 122 (1950), three plaintiffs in a personal injury action had specifically alleged in their complaints that their injuries had prevented them from performing their duties as ministers. On direct examination, one of the plaintiffs testified that she received an expense allowance when she was able to perform a certain amount of work as a minister of the Jehovah's Witnesses. On cross-examination, however, the plaintiffs objected to all questions concerning the circumstances of their ordination or the duties which they performed as ministers. The lower court overruled these objections and the Supreme Court affirmed, noting that "[t]he purpose [of the questions objected to] was to obtain substantive information necessary to supply deficiencies in the testimony given by plaintiffs in direct examination; if the answers to these questions, properly allowed in cross-examination, played any part in judging credibility, that effect was incidental . . . ." 364 Pa. at 241, 72 A. 2d at 123. The Court added that "[i]f the purpose of the cross-examination had apparently been to create prejudice against the parties because of their religious beliefs, the learned trial judge would undoubtedly have sustained the objections." 364 Pa. at 241, 72 A. 2d at 123-124.

Here, the religious beliefs of appellant and his witness were completely irrelevant to any issue involved in the

---

5. See McCormick, *Handbook of the Law of Evidence,* supra, n. 4, §48 at 101.

trial. They were never mentioned or alluded to anywhere on direct examination.[6] If the Commonwealth wished only to demonstrate appellant's friendship with Morrison, it could have done so without invading the privileged area of religion. Instead, it appears that the Commonwealth deliberately sought to place before the jury the fact that appellant and the only other defense witness belonged to a highly controversial religious group.

The blatant means by which the religious affiliation of appellant and his witness have been injected into this case bring to mind the words of former Chief Justice MAXEY in *O'Donnell v. Philadelphia Record Co.*, 356 Pa. 307, 346-347, n. 5, 51 A. 2d 775, 793-794, n. 5 (1947) (dissenting opinion), cert. denied, 332 U.S. 766: "This is the first time the writer ever heard of any attorney injecting into a case the religious affiliations of either a litigant or a witness . . . . If a *witness'* religious belief cannot properly be injected into a judicial proceeding, a *litigant's* religious belief certainly cannot be . . . . When plaintiff's counsel asked [defendant's chief executive] as to his knowledge of O'Donnell's religious affiliation and stated that affiliation, the trial judge should have immediately declared a mistrial. No verdict which may have been brought about, or even influenced by a consideration of a litigant's religious affiliations should be allowed to stand in a court of justice." (Emphasis in original.)[7]

---

6. The fact that defense counsel on redirect examination had Morrison testify that Muslims were under an obligation to tell the truth could hardly amount to an opening of the door on the issue of religion. The Commonwealth introduced the issue of religion only after the defense had completed its last direct examination, and defense counsel's question on redirect, after his motion for a mistrial had been denied, was only an attempt to minimize the effects of the Commonwealth's improper cross-examination.

7. Justices STERN and PATTERSON concurred in this dissent. The Majority in *O'Donnell* did not discuss this issue, perhaps because it had not been specifically raised on appeal as an assignment of error.

As appellant's trial turned solely on the credibility of himself and his witness, and as their credibility was improperly impeached on religious ground contrary to the letter and intent of the Act of April 23, 1909, supra, I believe that appellant must be granted a new trial.

JACOBS and SPAETH, JJ., join in this dissenting opinion.