PEOPLE v UMERSKA

Docket No. 78-329. Submitted November 20, 1979, at Detroit.—Decided January 22, 1980.

Lois Umerska was convicted, after a nonjury trial, of obtaining money under false pretenses, Wayne Circuit Court, Irwin H. Burdick, J. The defendant appeals, alleging that 1) by allowing the prosecution to call a surprise unendorsed witness on the second day of trial the trial court committed reversible error, 2) reversible error occurred because the police officer in charge of the case gave a false answer to defense counsel, and 3) questions by the prosecution and the trial court regarding the defendant's specific religious belief in witchcraft resulted in reversible error. *Held:*

1. The late endorsement of witnesses is within the discretion of the trial court, having due regard for a defendant's right to a fair trial. In the present case, defense counsel interviewed the witness 30 minutes prior to the endorsement and, in addition, the trial court offered defense counsel further time if counsel so desired. Defense counsel's cross-examination was thorough and vigorous and the defendant's rebuttal testimony indicated that the defense counsel was sufficiently familiar with the nature of the endorsed witness's testimony in time to prepare an adequate rebuttal. There was no error in this regard.

2. The statement made by the police officer that he knew "absolutely nothing" in response to a question posed by defense counsel as to whether anyone from the bank at which part of the transaction occurred would testify was apparently made in jest and cannot be condoned. However, the statement may not be imputed to the prosecutor. There is no showing of prejudice since defense counsel did have an opportunity to talk with the bank teller prior to the teller's endorsement as a witness and was given an opportunity to talk further with the witness if counsel wished to do so.

3. The defendant's belief in witchcraft as a religion was first

REFERENCES FOR POINTS IN HEADNOTES
[1] 41 Am Jur 2d, Indictments and Informations § 60.
   81 Am Jur 2d, Witnesses §§ 4, 74.
[2] 81 Am Jur 2d, Witnesses §§ 478 *et seq.,* 484.

introduced by defense counsel. Prior to the introduction of evidence of witchcraft as the defendant's religion, by the defense, the prosecution had asked the complainant and other witnesses whether the defendant had represented herself or was known to be a witch and whether she claimed to be a psychic. This was far different than questioning the defendant about her religion. The complainant was superstitious and feared witches and witchcraft in general. Once the defense brought up the issue of witchcraft as a religion in an effort to portray that witchcraft was a benign faith of love and trust and to show the complainant was not in fear of the defendant, there was no error in allowing the prosecution to cross-examine the defendant about her religious beliefs in witchcraft. The prosecution kept its inquiries on the subject to only what was necessary to attempt to show that it was the complainant's fear of the defendant due to the defendant's belief in witchcraft which was the reason for the complainant's delay in reporting the crime to the police. In addition, witchcraft and religion, if anything, are opposites as those terms are generally understood. No error resulted from the questioning by the prosecution on this matter.

Affirmed.

1. Witnesses — Criminal Law — Endorsement of Witnesses — Late Endorsement — Discretion.

Late endorsement of witnesses is within the discretion of the trial court, having due regard for a defendant's right to a fair trial.

2. Constitutional Law — Criminal Law — Defendant's Religious Beliefs — Witchcraft — Questions by Prosecutor.

The prosecution's questioning of a defendant and other witnesses about the defendant's belief in witchcraft as a religion was entirely proper where 1) the issue of the defendant's belief in witchcraft as a religion was introduced by the defendant, 2) the questioning was relevant to the motive of the complainant in delaying in reporting to the police a crime allegedly committed by the defendant, and 3) the questions asked by the prosecution were within the limits established by case precedent.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward R. Wilson,* Principal Attorney, Appeals, and *Ann B. Wetherholt,* Assistant Prosecuting Attorney, for the people.

*Rickel, Urso, Wokas & Earle,* for defendant on appeal.

Before: Allen, P.J., and M. J. Kelly and N. J. Lambros,* JJ.

Allen, P.J.

*Witches:* "Double, double, toil and trouble; Fire burn, and cauldron bubble." Macbeth, Act IV, Scene one.

Following a nonjury trial before Circuit Judge Irwin H. Burdick, defendant was found guilty, as charged, of obtaining money under false pretenses, MCL 750.218; MSA 28.415. On December 6, 1977, defendant was sentenced to probation for two years and ordered to pay $4,500 restitution to the complainant, Anna Groves.

The central issue at trial was whether a check for $4,500 given to defendant by Anna Groves on December 30, 1976, was a down payment on defendant's mobile home which had been up for sale or was, in fact, a repayment of a debt owed by Anna Groves to defendant. The facts as presented by the prosecution disclose that complainant, a middle-aged widow living on social security of about $200 a month and anticipating a modest inheritance from her husband's estate, had recently suffered a nervous breakdown and was superstitious to the point that she carried a small bag around with her to ward off evil spirits. She met defendant in the first week of November, 1976, when complainant responded to a Detroit News ad that defendant's mobile home was for sale. At the first meeting, defendant allegedly agreed to sell to complainant for the advertised price of $8,000, holding off the sale until complainant was able to sell the equity

---

* Circuit judge, sitting on the Court of Appeals by assignment.

in her present home. Complainant received the money on this sale of her home December 23, 1976, and, on December 30, went to defendant's residence to consummate the mobile home sale. There, she signed a check drawn on the Wayne Bank for $4,500 and accompanied defendant to the Wayne Bank where the check was exchanged for a cashier's check payable to defendant. The two women then went to defendant's bank where defendant deposited the check. The parties returned to defendant's home where, for the first time, defendant informed plaintiff the mobile home had already been sold to another party. However, as noted by the defendant, complainant did not protest or go to the police until February or March, 1977.

In the seven-week period between the parties' first meeting and December 30, 1976, complainant visited defendant's home on many occasions. It was on these visits that defendant told complainant she was a psychic, and did Tarot card readings for which she charged complainant $5 a reading. Over defense counsel's objections on grounds of relevancy, complainant testified that defendant claimed to be a witch with powers to cast a circle of protection around complainant so that nothing could harm her.

Defendant called five witnesses who gave an entirely different version of the facts. According to their testimony, Anna Groves became acquainted with defendant several months prior to December, 1976; that during this period defendant did Tarot card readings for her; that the parties became close friends to the point that on October 20, 1976, defendant gave Anna Groves $4,500 cash with the understanding it would be repaid when her late husband's estate was settled. The testimony also

discloses that after complainant was told the trailer had been sold to another party, she did not complain but, instead, continued to visit defendant; that she gave defendant a purse, shoveled snow, helped measure walls and conducted herself in a manner completely contrary to the way a normal person would react if swindled out of $4,500.

One of the defendant's witnesses, Roberta Jackson, stated on cross-examination that she and defendant shared a common belief in witchcraft *as a religion.* Another witness for the defendant, Patricia Williams, when asked on direct examination if she was afraid of defendant *because of defendant's religious beliefs,* responded in the negative. Defendant testified in her own behalf and, when asked by defense counsel about the content of her *religious beliefs in witchcraft,* explained that witchcraft was a religion teaching perfect love and trust. On cross-examination of defendant the prosecution asked a limited number of questions about witchcraft as a religion and about the sect's organization and officers. Finally, Anna Groves was called as a witness by the defense. At the close of her testimony the court inquired of her about defendant's belief that she was a witch and any statements defendant made concerning witchcraft in general. Similar questions were asked by the court at the conclusion of defendant's trial.

On appeal, defendant claims the trial court committed reversible error in three respects: (1) by allowing the prosecutor to call a surprise unendorsed witness on the second day of trial, (2) because the officer in charge of the case gave a false answer to defense counsel when, on the first day of trial, defense counsel asked if the prosecution planned to call anybody from the Wayne

Bank and the officer replied he knew "absolutely nothing", and (3) by allowing questions by the prosecution and the court about defendant's specific religious belief in witchcraft. Of the three issues raised, the third is the most substantive.

I.

Keith Doelker, the bank teller at the Wayne Bank who handled the December 30 check cashing was called as a witness after the prosecution moved on the second day of trial to endorse Doelker as a res gestae witness. Doelker was not endorsed on the information. The motion was granted over defense counsel's strenuous objection. On direct examination he testified that on December 30, 1976, two women came to his teller window, one of whom exchanged a $4,500 check drawn on the bank for a cashier's check. He recalled that one of the women said the check was for a trailer. In *People v Meadows,* 80 Mich App 680; 263 NW2d 903 (1977), this Court refused to find error when, during trial, the trial court granted the prosecution's motion for endorsement of a witness who had not been endorsed on the information. In sustaining the trial court's action the Court first noted that late endorsement of witnesses is within the discretion of the trial court, having due regard for a defendant's right to a fair trial, *People v Tann,* 326 Mich 361; 40 NW2d 184 (1949). The Court then found no abuse of discretion because (a) the trial court had given counsel a continuance to prepare for cross-examination, (b) counsel's cross-examination was vigorous, and (c) defendant's rebuttal testimony indicated defense counsel was familiar with the nature of the endorsed witnesses' testimony some time prior to trial. *People v Meadows, supra,* at 690.

The record reflects that all three conditions were met in the instant case. Defendant's counsel interviewed the witness 30 minutes prior to the endorsement and, in addition, the trial court offered counsel further time if counsel so desired. Counsel's cross-examination was thorough and vigorous, and defendant's rebuttal testimony indicated counsel was sufficiently familiar with the nature of the endorsed witness's testimony in time to prepare an adequate rebuttal. We find no error.

## II.

During the first day of trial, defense counsel inquired of Detective Lindburgh, a police officer assigned to assist the prosecutor in the preparation of the case, whether he "knew anything about anybody from the Wayne Bank". The detective responded "in jest" that he knew absolutely nothing even though the detective admitted that earlier that day he had talked with Wayne Bank officials about the check-cashing incident of December 30, 1976. Counsel contends this was a deliberate attempt by the prosecutor to conceal the fact that a bank teller would testify and, as such, is grounds for a new trial. *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). While we don't condone the statement made by Detective Lindburgh, we can't impute the officer's response to the prosecutor. The question was ambiguous. Unlike *Brady,* it was not a statement made by the prosecutor. More importantly, there is no showing of prejudice since counsel did have the opportunity to talk with the bank teller, Doelker, prior to Doelker's endorsement as a witness, and was given the opportunity to talk further with the witness if counsel wished to do so.

## III.

Defendant strenuously argues that the prosecution and the court violated the provisions of MCL 600.1436; MSA 27A.1436, which reads:

"No person may be deemed incompetent as a witness, in any court, matter or proceeding, on account of his opinions on the subject of religion. *No witness may be questioned in relation to his opinions on religion, either before or after he is sworn.*"

This statute was most recently construed in *People v Theodore Jones,* 82 Mich App 510, 516; 267 NW2d 433 (1978). In that case this Court said:

"The purpose of the statute *is to strictly avoid any possibility that jurors will be prejudiced* against a certain witness because of personal disagreement with the religious views of that witness. This object recognizes the deep personal feelings many people hold on religion, feelings that may unavoidably conflict with a juror's sworn duty to decide solely on the evidence presented, without injection of personal prejudices." (Emphasis supplied.)

After carefully examining the entire record of trial we find no violation of the statute in the instant case. Three reasons support our conclusion.

First, the subject of defendant's religious beliefs was first introduced by defense counsel. Up to that point the prosecutor had asked the complainant and other witnesses whether defendant had represented herself or was known to be a witch and whether she claimed to be psychic.[1] This is far

---

[1] The first reference to religion came when defense counsel on re-cross-examination of complainant questioned as follows:

"Q *[by Mr. Monash, defense counsel]:* Mr. Gutter [Assistant Prosecuting Attorney] questioned you about the issue of witchcraft or witchery. Did you discuss this on more than one occasion with Mrs. Umerska about witchcraft or witchery?

different than questioning defendant about her religion. An obvious weakness in the prosecution's case was the long delay between December 30, 1976, when complainant signed the check for $4,500, and late February and early March, 1977, when she first made demands on defendant's husband and then on defendant for repayment. The prosecution sought to explain the delay on grounds that Anna Groves knew defendant was a witch claiming certain psychic powers and was afraid of her. Since defendant introduced the matter of her religious beliefs into evidence, the prosecutor's questioning was entirely proper and quite within the limits allowed in *Theodore Jones, supra,* at 515, and *People v Bouchee,* 400 Mich 253, 262; 253 NW2d 626 (1977). In the 1978 Annual Survey of Michigan Law, Glicksman, *Evidence,* 25 Wayne L Rev 477, 506 (1979), Professor Glicksman comments on the *Theodore Jones* opinion as follows:

"The appellate court rejected defendant's argument as related to the questioning of defendant, *who had himself introduced the religious issue* by testifying that

"A Yes, about protecting.

"Q Was it discussed that the fact that witchcraft is a religion to some people?

"A To my knowledge it is a religion to the devil.

"Q To the devil?

"THE COURT: That wasn't his question.

"THE WITNESS: No, but this is the way that I feel.

"Q (By Mr. Monash): Did you hear my question that it is a religion to them?

"A Yes.

"Q Did you discuss witchcraft being a religion?

"A No.

"Q Were you afraid of her because of the word 'witchcraft'? Did that make you fearful?

"A It did."

The second reference to religion was also introduced by defense counsel when he was examining Roberta Jackson, a witness for defendant. Ms. Jackson testified that she and defendant shared a common religion.

he was a lay preacher in the church. In reversing defendant's conviction, however, the court held that the prosecutor improperly questioned defendant's character witness." (Emphasis added.)

The prosecutor's questions on cross-examination of Ms. Jackson concerning religious beliefs were limited to one fleeting reference after which, as on direct examination of the complainant, the prosecutor's questions were confined to whether defendant was a witch, was psychic or could put hexes on people.[2] Under these circumstances we decline to find error in the cross-examination of Ms. Jackson.

Second, defense counsel cannot have it both ways. Counsel may not have the benefit of responses to questions asked by him which are designed to show the favorable side of defendant's beliefs but deny the people the right to ask any questions at all on the testimony introduced. It was obvious from the testimony that complainant feared witches and witchcraft in general. To obviate this belief, defense counsel asked a series of questions, the responses to which rebutted the popular belief that witchcraft was an invention of the devil but, instead, was a benign faith of love and trust.

"Q (By Mr. Monash): Would you explain what this

[2] "Q My question was, was there any discussion with regard to witchcraft?

"A Witchcraft, that's our religion.

"Q Your religion?

"A If you be nice to other people, they'll be nice to you. We have perfect love and perfect trust and live in perfect trust and harmony.

"Q Have you ever expressed that you can put hexes or signs on people that would cause bad things to happen to them?

"A Absolutely not. We don't believe in it.

"Q Have you, in the recent past, done anything like that to somebody?

"A I never had. We don't believe in it."

means to you? Just explain what the word witch; witchery; witchcraft means to you?

"A *[defendant]* First of all, we are a religion that is over 40,000 years old. We are the original religion from whence all of the religions came. The word 'witch' is a paraphrasing; something that has been added, which comes from the anglo saxon word meaning wise.

"In pagan—in early times, we were judges, doctors and knowledgeable people and being a witch, it has nothing to do with anything other than religion. Much is made—

"THE COURT: (Interposing) I'm missing half of what you're saying as to what it means to you.

"A (By the Witness): It is a religion. It is not new. It means simply wise one. That comes way back from early times. We practice perfect love and perfect peace. With the onset of christianity, many of us were murdered. So, there came—

"MR. MONASH: (Interposing) That isn't—I'm not asking for a history of it.

"Q (By Mr. Monash): You say it's a religion to you and it means certain things, in terms of love, trust and belief.

"A What it means to me, we live it everyday, as opposed to putting it on, on sabbath or holy days.

"Q And your belief of this religion, does it in any way, shape or form, mean casting spells or hexes on other people?

"A Casting evil spells? We don't believe in evil."

It was only after the above line of questions were elicited by defendant on direct examination that the prosecution on cross-examination briefly inquired about defendant's religious belief.

Third, the trial court's questions at the conclusion of defendant's testimony and of complainant at the conclusion of her testimony were basically inquiries as to whether defendant stated she was a witch, whether witchcraft was discussed and whether defendant claimed to be psychic. We disagree with defendant's argument that such ques-

tions are, in themselves, questions about the witness's "opinions on religion". If anything, witchcraft and religion, as those terms are generally understood, are opposites. Black's Law Dictionary, 4th ed (1957), defines witchcraft as "supposed intercourse with evil spirits" and defines religion as "one's views of his relations to his Creator and to the obligations they impose of reverence for his being and character and of obedience to his will". In the American Heritage Dictionary of English Language, religion is defined as "the expression of man's belief in and reverence for superhuman power recognized as the creator and governor of the universe". In view of these definitions we find it does violence to the statute to conclude that, by merely asking if defendant was a witch, whether she discussed witchcraft and whether she represented she had psychic powers, the statute was violated.

We find the following excerpt from the Encyclopedia Britannica entitled "Witchcraft" apposite to the facts of this case:

"Those who have unexplained illness, persistent nightmares, or continuing psychological distress may wonder if they are not being bewitched—or those close to them will suggest this possibility. Divination may be attempted to determine if witchcraft is the cause, who is carrying it out, and what methods are being used *(see* AZANDE). Ceremonial protection and cure may be advised. All these measures impose considerable economic expense on the supposed victim and his relatives. If the symptoms do not disappear, anxiety may grow into terror, and the sufferer becomes wan, sleepless, emaciated; the original difficulty is aggravated by the burdens of emotional disturbance. Even if clear-cut bodily symptoms are absent at first, the nervous system may be deranged under strong fear of witchcraft, producing phenomena similar to those of surgical shock leading in

some cases to the victim's death." 23 Encyclopedia Britannica, Witchcraft, 604, 606 (1967).

The above quoted excerpt lends credence to the prosecutor's theory that complainant's reason for not reporting the alleged crime was her fear of defendant who openly claimed to be a witch. It also explains why defense counsel injected testimony that witchery was a religion and the religion was one of love and trust. Under the circumstances, we believe it was proper for defendant to introduce such testimony. But, once having done so, we find no error in the extremely few questions asked by the prosecution on the matters testified to. Had the prosecutor or the court inquired whether defendant's belief was in God or whether defendant's obligation was directed toward someone or something other than a Supreme Being known as God, error might well be found. *People v Wells,* 82 Mich App 543; 267 NW2d 448 (1978), *People v Hall,* 391 Mich 175; 215 NW2d 166 (1974). But because the prosecutor's and the court's inquiries were not in that vein, we find no violation of the statute.[3]

Affirmed.

---

[3] We also note that the instant case was tried without a jury and nothing in the court's written opinion indicates that the testimony about defendant's religious belief led the court to hold in favor of plaintiff.