STATE OF CONNECTICUT *v.* CURTISS HEINZ
(3382)

HULL, BORDEN and SPALLONE, Js.

Argued October 9—decision released December 25, 1984

*Vincent J. Trantolo,* for the appellant (defendant).

*Carl Schuman,* assistant state's attorney, with whom, on the brief, were *Rosita Creamer,* assistant state's attorney, and *Maureen Platt,* deputy assistant state's attorney, for the appellee (state).

BORDEN, J. This case comes to us on a remand from the Supreme Court. That court had granted petitions for certification by both the state and the defendant from a decision of the Appellate Session of the Superior Court; *State* v. *Heinz,* 38 Conn. Sup. 570, 455 A.2d 346 (1982) (*Heinz I*); and, after resolving the claims raised by the petitions, it remanded the case to this court[1] for consideration of other claims of error which neither the Supreme Court nor the Appellate Session had had the occasion to resolve. *State* v. *Heinz,* 193 Conn. 612, 631, 480 A.2d 452 (1984) (*Heinz II*).

The facts of the case have already been stated in the two previously reported decisions and need not be fully repeated here. Suffice it to say that they involve four performances by female "exotic" dancers at a cafe in East Hartford known as the Venus Lounge, of which the defendant was the liquor permittee. Two of the performances took place on December 19, 1979, when the defendant was on the premises, and two on January 9, 1980, when he was not seen on the premises. The defendant was convicted of four counts of promoting an obscene performance in violation of General Statutes § 53a-194. The four counts correspond to the four performances.

The procedural history of this case is also documented in the two previous decisions and need not be described

[1] Appeals formerly filed in the Appellate Session of the Superior Court have been transferred to the Appellate Court by Public Acts, Spec. Sess., June, 1983, No. 83-29, § 3; General Statutes § 51-197a.

at length here. In short, the defendant appealed to the Appellate Session which held that counts two, three and four should be dismissed, and that a new trial was required on count one. *Heinz I,* supra. Thereafter, the Supreme Court granted the defendant's petition for certification to appeal from the decision of the Appellate Session on count one and the state's petition for certification to appeal from the decision of the Appellate Session on counts three and four.

The Supreme Court found no error on the defendant's appeal, found error on the state's appeal and remanded the case to this court for resolution of the defendant's claims of error on counts three and four.[2] *Heinz II,* supra. The posture of the case upon its arrival in this court, therefore, is that a new trial is required on count one, count two is to be dismissed, and the defendant's remaining claims of error must be addressed. On those claims, we find error.

I

The first issue requires little discussion. The state concedes that the evidentiary error found by the Appellate Session on count one and affirmed by the Supreme Court; see *Heinz II,* supra, 627–28; also applies to counts three and four, but it attempts to persuade us that we should hold the error harmless as to those counts. Because we find other errors requiring a new trial on counts three and four, which errors involve issues which are likely to recur, and because it is not

---

[2] The defendant also claimed error in the trial court's failure to grant his motion to correct an illegal sentence and in its charge to the jury regarding the effect of a regulation of the liquor control commission. Because we find error on counts three and four, necessitating a new trial, we need not reach the claim criticizing the sentence. Likewise, upon examination of the claimed error in the charge to the jury, we conclude that it is unlikely this particular situation will recur at the new trial, and we do not reach that issue here. *Jacques* v. *Carter,* 2 Conn. App. 27, 35 n.5, 476 A.2d 621 (1984). We express no opinion on the merits of these claims.

likely that this evidentiary error will recur, we need not consider the state's argument. See footnote 2, supra.

## II

The defendant argues that the court erred in restricting his cross-examination of two of the state's principal witnesses, Robert F. Kenary of the East Hartford police department and James Malcolm of the Hartford police department. We agree.

Kenary was assigned to investigate the activities at the Venus Lounge with Malcolm, who was unknown in East Hartford, assisting him. Their testimony on direct examination described in detail the performances of January 9, 1980.

The trial was conducted in February, 1981, approximately fourteen months after the night in question. Kenary used his affidavits, which he had prepared the day after his observations, to refresh his recollection of many of the details of the performances. Malcolm testified solely from memory. Neither had made any notes at or after leaving the Venus Lounge that night.

Kenary testified on cross-examination that after leaving the Venus Lounge they went to investigate another cafe in East Hartford known as Pompei's, where they observed two performances by female dancers. He also testified that he had three beers at the Venus Lounge, three beers at Pompei's, and one beer at home after going off duty that night. Malcolm testified on cross-examination that he had three or four beers at the Venus Lounge, and that he had a total of six beers that night at both the Venus Lounge and Pompei's within a period of two and one quarter hours.

The defendant's principal challenge to the evidentiary rulings of the court involve his attempts to elicit from Kenary and Malcolm testimony regarding the effect

of this consumption of alcohol on their abilities to recall what they observed that night.[3] The defendant attempted to ask Kenary in effect whether the alcohol he had consumed could have affected his ability to recall what he observed that night and thus what he wrote the next day in his affidavit. In a similar vein, the defendant attempted to cross-examine Malcolm by inquiring into his experience with alcohol as a police officer, and by asking him about the effect of alcohol on the ability to recall. The court sustained the state's objections, and the defendant duly excepted.

The defendant claims that these rulings limiting his cross-examination of Kenary and Malcolm deprived him of the right of confrontation provided by the sixth and fourteenth amendments to the United States constitution. Although we do not think that they rise to the level of a constitutional violation, we conclude that under the particular facts of this case they were an abuse of discretion by the trial court.[4]

" 'The right of an accused to effectively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. . . . The general rule is that restrictions on the scope of cross-

---

[3] In his brief, the defendant appears to argue that the trial court also erred in restricting his attempt to cross-examine Kenary and Malcolm about whether they might have confused the performances at Pompei's with those at the Venus Lounge. The particular rulings which he cites in support of this argument, however, involve questions about their consumption of alcohol and its effect, and do not involve that possible confusion. We therefore consider only these rulings.

[4] We reject the state's initial argument that the defendant's claim is not reviewable because he did not make a formal offer of proof. We know of no such requirement as a precondition of review of a claimed error in restricting cross-examination. The cases relied on by the state; *State* v. *Gooch,* 186 Conn. 17, 24, 438 A.2d 867 (1982); *State* v. *Rodriguez,* 180 Conn. 382, 393, 429 A.2d 919 (1980); involved evidence excluded on direct examination. Furthermore, the defendant made quite clear the grounds of his claim to the admissibility of the evidence which he sought to elicit. See Practice Book § 288.

examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment.' " (Citations omitted.) *State* v. *Asherman,* 193 Conn. 695, 718, 478 A.2d 227 (1984). "The constitutional standard is met when defense counsel is 'permitted to expose to the jury the facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' " *State* v. *Gaynor,* 182 Conn. 501, 509, 438 A.2d 749 (1980), quoting *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Thus, a claim of undue restriction on cross-examination ordinarily involves a two-pronged analysis: whether the constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion. *State* v. *Gaynor,* supra, 509–10.

Here, the constitutional standard was met. The defendant was permitted to bring before the jury the facts that Kenary had seven and Malcolm had six beers the night of January 9, 1980, and that Kenary prepared his affidavits, on which he relied in his testimony, the next day. The confrontation clause does not require that the defendant be permitted also to elicit from the officers the opinion that consumption of alcohol during and after observing something can affect one's ability accurately to observe and later recall what one observed. This is so, however, not because, as the trial court ruled, there is no such effect. It is so because it is an effect which is common knowledge and is an inference which is clearly within the ability of the jurors, as laypersons, to draw based on their own common knowledge and experience. The jury may, without the aid of expert testimony, use the consumption of alcohol as a basis on which to infer impairment of ability to observe and recall accurately. *D'Amato* v. *Johnston,*

140 Conn. 54, 58, 97 A.2d 893 (1953) (intoxication and its accompaniments are a matter of general knowledge); McCormick, Evidence (2d Ed.) § 45 n.23; see also *Prisk* v. *State,* 137 Conn. 35, 36, 74 A.2d 462 (1950). Therefore, while this was evidence which the trial court could, in its discretion, have permitted, we do not find that it violated the defendant's rights under the sixth and fourteenth amendments by declining to do so.

This leaves the question of "whether the trial court abused its discretion in restricting the scope of cross-examination. 'To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [his] cross-examination were clearly prejudicial.' . . . 'The purpose of such cross-examination is to test the credibility of the witness and the accuracy and reasonableness of his direct testimony.' " (Citations omitted.) *State* v. *Gaynor,* supra, 510. A combination of factors persuades us that the court not only "would have been well advised to have exercised its discretion in favor of permitting the inquiry"; *State* v. *Asherman,* supra, 721; but also that it abused its admittedly "wide discretion in fixing the limits of cross-examination . . . on the issue of credibility"; *State* v. *Miller,* 186 Conn. 654, 670, 443 A.2d 906 (1982); in barring that inquiry.

First, Kenary's and Malcolm's descriptions of the performances were critical to the state's case. Whether a particular performance is obscene depends necessarily on a number of important factors, one of which is the relation to the entire performance of those parts of it which are sexually explicit. See *Miller* v. *California,* 413 U.S. 15, 24, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973); *State* v. *Andrews,* 150 Conn. 92, 97, 186 A.2d 546 (1962). Thus, the extent to which Kenary and Malcolm could accurately observe and later recall the details of that performance and the relation of those details to the entire performance were important to their credibility as witnesses.

Second, Kenary's and Malcolm's testimony formed the factual basis of the opinions of the other witnesses for the state that the performances were obscene. This was not a case, like one involving a book or movie, in which the jury could view the allegedly obscene material. Cf. *State* v. *Gagliardi,* 174 Conn. 46, 381 A.2d 1068 (1977). It had to depend, first, on Kenary's and Malcolm's testimony, tested under the flame of cross-examination, and second, on the opinions of those other witnesses based on hypothetical questions incorporating that testimony. Even when one has the material at hand the decision of obscenity vel non, which implicates the first amendment, is not ordinarily simple and straightforward.[5] Where, as here, the material is supplied only through verbal description by witnesses, the accuracy of that description should be subject to a wide latitude on cross-examination.

Third, the trial court, in the manner in which it sustained the state's objections, essentially ruled out of the case any inference which the jury might otherwise have been willing to draw about the effect of alcohol on Kenary's and Malcolm's abilities to observe and recall and on the reliability of their testimony, based as it was on observations made before and while drinking. In the presence of the jury, the court twice remarked that the number of beers consumed by Kenary had no bearing on his ability to prepare his affidavit the next day, and once remarked that the defendant's cross-examination on the effect of Malcolm's

[5] We are reminded of Justice Stewart's famous dictum: "I have reached the conclusion . . . that under the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." *Jacobellis* v. *Ohio,* 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964) (Stewart, J., concurring).

drinking was limited to a claim that Malcolm was intoxicated or under the influence of liquor. The jury should have been permitted to draw whatever inferences it deemed to be reasonable about the effect of that consumption of alcohol, without the burden of those remarks by the trial court barring or limiting such inferences.

We agree with the state that "[t]he inferences which the defendant attempted to elicit from the [witnesses] are so obvious that they could as readily be drawn by the jury . . . ."; *State* v. *George,* 194 Conn. 361, 373, 481 A.2d 1068 (1984); but the difference here is that, because of the manner of the court's rulings, those inferences could not be "as well articulated by the defendant's counsel in his summation." Id. Indeed, our examination of that argument indicates that his counsel, in apparent deference to the court's remarks, avoided arguing those obvious inferences. We have, moreover, examined the entire cross-examination of Kenary and Malcolm, as we must in passing on a claim of undue restriction of cross-examination. *State* v. *Asherman,* supra. That examination does not alter our conclusion that the trial court abused its discretion in this case.

## III

The defendant next argues that the trial court unduly restricted his cross-examination of another of the state's key witnesses, Mary Ann Pressamarita, with regard to four separate but related series of questions. We agree that the court erred on two of those series, but we find no error on the other two.

The state presented Pressamarita as an expert witness to give her opinion that the performances were obscene. On direct examination, presented by the state and through a limited voir dire by the defendant directed at her competence as an expert, she testified

essentially as follows: She is an East Hartford house-wife who belongs to several organizations which concern themselves with the issue of obscenity. One such statewide organization is Connecticut Citizens for Decency (CCD), of which she was a founder and which has 1400 members from throughout the state, representing seventy towns. CCD meets two or three times per year in order to discuss how to fight pornography, and through her membership in it she has become familiar with the contemporary community standards prevailing in the state.[6] She is a religious, conservative Catholic. Any good, moral person would be offended by nudity and sex. Her opinion regarding the contemporary community standards is not colored by her religious beliefs.

In response to hypothetical questions summarizing the descriptions of the performances supplied by Kenary and Malcolm, Pressamarita gave her opinion, based on her experiences and the community standards, that the performances described were obscene.

## A

The first series of rulings on cross-examination of Pressamarita of which the defendant complains concerns his attempt to inquire into her membership in a religious organization known as the Blue Berets. She testified on cross-examination that, in addition to the CCD, she was a member of that organization, which is concerned with obscenity.

The defendant asked two questions: "What is the Blue Berets?" and "How did the Blue Berets get their name?" The basis of the defendant's questions was to test whether her membership in the Blue Berets had

---

[6] General Statutes § 53a-193 (a) provides in pertinent part as follows: "Whether a material is obscene shall be judged by ordinary adults applying contemporary community standards. In applying contemporary community standards, the state of Connecticut is deemed to be the community."

any significance on the opinion she gave on direct examination. The court sustained the state's objections on the basis that the witness need not answer questions about her religious beliefs or associations,[7] and the defendant excepted.

In connection with these questions the defendant made a documentary offer of proof by way of marking for identification several newspaper articles and letters to the editor, one from Pressamarita. These articles and letters described the Blue Berets.

The gist of these documents is as follows: She and the Blue Berets believe that the Virgin Mary gives them messages through miraculous Polaroid instant photographs. The Virgin Mary commands that they use Polaroid in order to preclude darkroom fraud and to demonstrate the authenticity of the images of Jesus, Mary, St. Michael, St. Theresa, Satan and another demon known as Fat Lips, expected to appear in the photographs. The name of the group derives from the Virgin Mary's instruction to them to wear blue berets in order to symbolize their membership in heaven's army. The Virgin Mary gives them instructions through the trances of Veronica Leuken, a housewife in Bayside, New York, where the group goes periodically for vigils

---

[7] The court stated as follows: "I think I can protect the witness in this case. No witness in my court ever has to answer any questions about religious organizations or associations which they are part of. I would claim that refusing to answer or just reluctance to answer would be safeguarded under the Constitution and under the rules of this court. And if a witness, for any reason, declines to answer, I think that would be acceptable. On the other hand, if a witness has no hesitancy about it, what's the harm? . . . I would simply point out to the witness that in my court, it's not that you have any basis for being sensitive about it but I would protect any witness without their asking the Court for protection on any question of religious affiliation or a witness has a right to decline to answer, as far as I'm concerned. And so that you may avail yourself of that privilege without any hesitation at any point and decline to answer the question, on that basis." Pressamarita, following the court's remarks, declined to talk about her religious beliefs.

at a styrofoam likeness of the Virgin Mary. The Blue Berets have pressured the East Hartford town council into passing "a tough anti-smut" law. The CCD is a political arm of the Blue Berets.

Pressamarita is quoted in these documents as follows: "The blue berets are a sign, among other things, that we are submissive to our husbands. . . . We feel women should be home, raising their families." "We look like a bunch of fanatics, a bunch of nuts. . . . We don't care—we're fools for Christ." "We are going to start calling ourselves Connecticut Citizens for Public Decency. . . . We have lots of friends in the Protestant community who believe in the things we believe in. It's not just Catholics."[8]

This record convinces us that, by sustaining the objections to the defendant's questions, the court did not permit the "defense counsel . . . 'to expose to the jury the facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' " *State* v. *Gaynor,* supra, 509. Thus, the court's rulings violated the defendant's " 'right . . . effectively [to] cross-examine an adverse witness . . . embodied in the confrontation clause of the sixth amendment.' " *State* v. *Asherman,* supra, 718.

Pressamarita was offered as an expert witness on the critical issue of whether the performances in question violated statewide contemporary community standards. The basis of her knowledge of those standards was her connection with the CCD. The defendant's offer of proof demonstrated a close connection between the CCD and the Blue Berets, and that in fact the two groups may be essentially one. The offer also demon-

---

[8] The exhibits for identification also contain an open letter from Pressamarita to Archbishop John F. Whealon decrying his apparent admonition to Catholics to "stay away" from Lueken's shrine, which is not approved by the local bishop.

strated that the members of the Blue Berets, including Pressamarita, hold attitudes and beliefs, however sincere, which the jury could find to be at variance with community standards. At the least, it offered a basis on which the jury could find that Pressamarita's testimony regarding those standards was not reliable. The defendant was entitled to attempt to convince the jury that Pressamarita's view of those standards was inaccurate, and that her opinions about the performances were based, not on those standards, but on her own private views, as expressed through the Blue Berets. Without this critical information, the jury was deprived of the necessary facts from which it could appropriately draw inferences about Pressamarita's reliability. See *State* v. *Gaynor,* supra.

We recognize that ordinarily a witness' religious beliefs are not a proper subject of inquiry on cross-examination, unless their relevance to a substantive issue in the case outweighs the witness' interest in privacy and the danger of prejudice. McCormick, Evidence (2d Ed.) § 48; see Part II B, infra. Here, however, the questions were neither aimed at nor framed in terms of Pressamarita's religious beliefs. They sought to show that her direct testimony was based, not on the contemporary community standards with which she professed to be familiar through the CCD, but on a set of beliefs inconsistent with those standards. The fact that the Blue Berets, which vivifies her beliefs, is religious in origin could not shield Pressamarita from an inquiry designed to illuminate that inconsistency.

## B

The defendant's next claim more directly implicates the question of the propriety of cross-examination of Pressamarita regarding her religious and moral beliefs. She had testified on direct examination that her opinion regarding the contemporary community standards

was not colored by her own religious beliefs. On cross-examination she testified without objection that her opinion was based on her moral beliefs and that her religious beliefs did have an effect on her opinion of whether the performances described to her were obscene.

The defendant then asked her five questions aimed at her moral and religious beliefs,[9] to which the court sustained the state's objections. The defendant duly excepted.

The religious beliefs of a witness are generally not a proper subject of cross-examination for the purpose of impeaching her credibility. *People* v. *Baseer,* 90 Ill. App. 3d 866, 414 N.E.2d 5 (1980); *McClellan* v. *Owens,* 335 Mo. 884, 74 S.W.2d 570 (1934); 27 A.L.R.4th 1167, 1168. Such an inquiry is ordinarily irrelevant to the issues at hand, inflammatory and unduly prejudicial. *Contemporary Mission, Inc.* v. *Bonded Mailings,* 671 F.2d 81, 84 (2d Cir. 1982); *United States* v. *Sampol,* 636 F.2d 621, 666 (D.C. Cir. 1980); *State* v. *Thomas,* 130 Ariz. 432, 636 P.2d 1214 (1981); *State* v. *Duke,* 362 So. 2d 559, 560–61 (La. 1978).

This general prohibition against cross-examination on one's religious beliefs is not absolute, however. Such

---

[9] These five questions are as follows: (1) "I take it, ma'am, that although your decision and the answers that you gave [the assistant state's attorney] were in fact based in part on your religious beliefs, you do not want to discuss your religious beliefs in this courtroom?"

(2) After Pressamarita testified that she considered herself an activist in the area of obscenity and pornography: "Okay, and is it not true that that activity, to a great extent, is based upon your strong belief that you have a calling from God . . . to eliminate obscenity and profanity in our society?"

(3) "Don't your religious beliefs bias your opinion . . . on the obscenity?"

(4) Following Pressamarita's testimony that part of her opinion was based on her moral beliefs, and that there is a difference between her moral and her religious beliefs: "Do you feel that your morality in any way is affected by your personal religious beliefs?"

(5) "Do you feel you have a strong moral calling from God?"

cross-examination is permissible, in the court's discretion, if it is relevant to the substantive issues of the case and if its relevance outweighs any prejudicial effect and the privacy interest of the witness. McCormick, Evidence (2d Ed.) § 48; 8 Wigmore, Evidence (McNaughton Rev.) § 2213; 27 A.L.R.4th 1167, 1172–73; 76 A.L.R.3d 539, 548 n.20; see, e.g., *Asbill* v. *State,* 390 So. 2d 1168 (Ala. App. 1980); *Commonwealth* v. *Mimms,* 232 Pa. Super. 486, 492–96, 335 A.2d 516 (1975) (Hoffman, J., dissenting); *McKim* v. *Philadelphia Transportation Co.,* 364 Pa. 237, 72 A.2d 122 (1950); *Allen* v. *Guarante,* 253 Mass. 152, 148 N.E. 461 (1925). Furthermore, cross-examination about religious beliefs is proper if the topic was raised on direct examination, even if it would otherwise be inadmissible. *People* v. *Baseer,* supra, 871–72; *People* v. *Umerska,* 94 Mich. App. 799, 807–808, 289 N.W.2d 858 (1980); 27 A.L.R.4th 1167, 1173.

We are not persuaded that exclusion of the answers to these questions amounted to a violation of the defendant's constitutional right of confrontation. We are persuaded, however, that for a coalescence of reasons the trial court abused its discretion in excluding those answers.

First, the question of whether Pressamarita's religious beliefs affected her opinions on obscenity was raised by the state in her direct examination, when she asserted that her opinions were not so affected. Thus the truthfulness of that assertion was fair game for cross-examination.

Second, the nature of Pressamarita's testimony on direct examination was not simply what she had observed. Her testimony was an opinion on the obscenity of a performance, a matter which is itself fraught with moral overtones. Furthermore, her testimony was laced with moral judgments. She testified

that any good, moral person would be offended by nudity and sex, that the performance would shock, repel or disgust the average Connecticut resident, that the performance was an affront to public decency and demoralizing to the community, and that it expressed ideas, "but not good ones."

Third, Pressamarita's testimony was central to the question to the defendant's guilt or innocence, since the challenged material was not before the jury in this case. *Paris Adult Theatre I* v. *Slaton,* 413 U.S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973). It therefore had to rely on the description of the performances by Kenary and Malcolm, and the characterization of that description by Pressamarita and the other two expert witnesses offered by the state.

Finally, the defendant's offer of proof about the Blue Berets and Pressamarita's central role in that group afforded a substantial basis for an inference that her moral and religious beliefs are intertwined with an active attempt to combat what she considers obscene. Thus the jury, had it had access to her connection with that group and its beliefs, could have entertained doubt about the objectivity of her opinions.[10]

## C

We consider the defendant's final two evidentiary claims together. One concerns the exclusion of his attempt to cross-examine Pressamarita about the

---

[10] Having examined the entire cross-examination of Pressamarita, we reject the state's argument that there was enough other material brought out on cross-examination for the jury adequately to gauge her credibility. We also find no need to consider the state's argument that the error, if any, was harmless. The practical significance of the "harmless error" rule is to determine whether an error requires a new trial. *Manning* v. *Michael,* 188 Conn. 607, 611, 452 A.2d 1157 (1982). We have already decided that a new trial is required. The purpose of our inquiry here is simply to rule on issues which are likely to recur, in order to give guidance to the trial court at that new trial.

efforts of the CCD to have a particular book removed from schools. The other concerns the exclusion of his attempt to cross-examine her about her son's arrest for public indecency and whether she considered his conduct obscene. As to both, the trial court was clearly within its discretion, since they both were collateral matters likely to " 'confuse rather than to illuminate the case.' " *State* v. *Gaynor,* supra, 511.

In accordance with the remand of the Supreme Court in *State* v. *Heinz,* 193 Conn. 612, 480 A.2d 452 (1984), on count one, the judgment is set aside and the case is remanded for a new trial. In accordance with the remand of the Appellate Session in *State* v. *Heinz,* 38 Conn. Sup. 570, 455 A.2d 346 (1982), on count two, the judgment is set aside and the case is remanded with direction to dismiss that count.

There is error as to counts three and four, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.