### STATE OF CONNECTICUT *v.* DUANE CLARK
### (AC 18365)

Lavery, C. J., and Foti and Landau, Js.

Argued September 14, 2000—officially released March 6, 2001

*Michael O. Sheehan*, special public defender, for the appellant (defendant).

*Rita M. Shair*, assistant state's attorney, with whom were *Michael Dearington*, state's attorney, and, on the brief, *Elpedio N. Vitale*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Duane Clark, appeals from the judgment of conviction, rendered after a jury trial, of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c.[1] On appeal,[2] the defendant claims that the trial court improperly (1) admitted evidence of uncharged misconduct, (2) allowed the state to exclude a member of the defendant's racial group from the jury and (3) instructed the jury that it could not speculate regarding the effect that a witness'

---

[1] General Statutes § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when he possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . ."

[2] The jury acquitted the defendant of the charges of murder in violation of General Statutes §§ 53a-8 and 53a-54a (a) and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a).

admitted use of marijuana had on the witness' ability to see and comprehend the events. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Tyrese Jenkins, Hopeton Wiggan, David D., Kenny Cloud and Brucie B. were members of a gang named after a housing project in New Haven. On October 7, 1996, at approximately 11:15 p.m., the gang members went to a housing project, also located in New Haven and referred to as "the ghetto," to settle a dispute with the defendant and others, who were members of a rival gang.[3]

Cloud stayed in the car, while Jenkins, Wiggan, David D. and Brucie B., with guns at their sides, went looking for the defendant. The four men entered the housing project through a hole in a fence. As they approached, they noticed the defendant with three others, namely, Charles Green, Bobby "B.O." Cook and Ryan Baldwin, who were standing and talking near a green electrical box. When the defendant and the others noticed the gang members approaching, the defendant exclaimed, "Shoot the motherfucker," and a gunfight ensued.

When the first shots were fired, Wiggan and Brucie B. ran for cover behind a dumpster, and Jenkins ran diagonally across a parking lot located in the complex. Both sides exchanged a barrage of gunfire. As Wiggan, Brucie B. and Jenkins retreated from the complex, Jenkins was shot in the leg. He continued to hobble quickly away from the complex until another bullet struck him and he collapsed. Wiggan and Brucie B. went back into the complex and found Jenkins sitting up against a wall. The two picked up Jenkins and carried him to the car. Cloud, David D., Brucie B. and Wiggan took Jenkins to

---

[3] The dispute arose from an earlier confrontation at a club in New Haven where one of the members of the defendant's gang, namely, Charles Green, allegedly shot at some members of the rival gang.

Yale-New Haven Hospital, where he died from his injuries.

Leroy Townsend, a local man, was standing near the electrical box, smoking marijuana,[4] when he witnessed the beginning of the disturbance. At trial, Townsend testified that he saw the defendant at the scene with a pistol and that he heard him say, "Shoot the motherfucker," to Green.[5]

Arkady Katsnelson, a forensic pathologist, performed an autopsy on the victim. Katsnelson testified that Jenkins suffered two bullet wounds, one of which was fatal. One bullet, a nine millimeter round, entered the lower front portion of Jenkins' right leg and exited from the back of it. The other bullet, a .44 caliber round, which caused the fatal wound, entered through the upper right side of Jenkins' chest just below his collarbone and then penetrated his chest wall, right lung, heart, diaphragm, part of his liver and organs of his abdomen, and eventually lodged in his abdominal cavity. Additional facts will be provided as needed.

I

The defendant first claims that the court improperly admitted evidence of prior uncharged misconduct committed by him because the admission of this evidence prejudiced him, and, therefore, he is entitled to a new trial. Specifically, the defendant contends that the court improperly admitted Idella Davis' testimony that she saw the defendant in possession of a nine millimeter handgun approximately one week prior to the shooting in the present case. In response, the state argues that the court did not abuse its discretion by admitting the

[4] Townsend's testimony revealed that he smoked five marijuana cigarettes that evening in a relatively short period of time.

[5] After a joint trial with the defendant, the jury found Green guilty of conspiracy to commit murder, murder as an accessory and criminal possession of a pistol or revolver.

evidence because Davis' testimony did not unduly prejudice the defendant and because it established that the defendant had the means necessary to commit the crime. We agree with the state.

The state made an offer of proof, outside the presence of the jury, regarding the admission of this evidence. The defendant objected on the grounds that the evidence was too far removed from the incident giving rise to the present case and that it unduly prejudiced him. The court overruled the defendant's objection and admitted the evidence at trial.

"The standard of review is clear. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . *State* v. *Cooper*, [227 Conn. 417, 426–27, 630 A.2d 1043 (1993)]. . . . *State* v. *Oliver*, 48 Conn. App. 41, 51, 708 A.2d 594, cert. denied, 244 Conn. 930, 711 A.2d 729 (1998).

"Evidence of a defendant's prior misconduct is not ordinarily admissible to prove his bad character or criminal tendencies. *State* v. *Williams*, 203 Conn. 159, 185, 523 A.2d 1284 (1987); see *State* v. *Ortiz*, 40 Conn. App. 374, 378, 671 A.2d 389, cert. denied, 236 Conn. 916, 673 A.2d 1144 (1996). Evidence of other misconduct, however, may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity . . . or an element of the crime. . . . *State* v. *O'Neill*, 200 Conn. 268, 273, 511 A.2d 321 (1986); *State* v. *Sierra*, 213 Conn. 422, 428–29, 568 A.2d 448 (1990); *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982); *State* v. *Busque*, 31 Conn. App. 120, 128, 623 A.2d 532 (1993), appeal dis-

missed, 229 Conn. 839, 643 A.2d 1281 (1994). Such evidence, however, to be admissible must also be relevant and material. *State* v. *Asherman*, 193 Conn. 695, 728, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Smith*, 198 Conn. 147, 157, 502 A.2d 874 (1985); *State* v. *Ibraimov*, supra, 352; *State* v. *Wiedl*, 35 Conn. App. 262, 265, 644 A.2d 1313, cert. denied, 231 Conn. 914, 648 A.2d 160 (1994).

"The trial court has broad discretion not only to rule on the relevancy of evidence; *State* v. *Jones*, 205 Conn. 638, 666–67, 534 A.2d 1199 (1987); but also to determine the scope of cross-examination. *State* v. *Cooper*, [supra, 227 Conn. 431]; *State* v. *Hernandez*, [224 Conn. 196, 208, 618 A.2d 494 (1992)]; *State* v. *Sharpe*, 195 Conn. 651, 657, 491 A.2d 345 (1985). Uncharged misconduct evidence must satisfy a two part test in order to be admitted as an exception. The evidence must be relevant and material to at least one of the claimed exceptions and its probative value must outweigh its prejudicial effect. *State* v. *Cooper*, [supra, 427]. *State* v. *Wiedl*, supra, 35 Conn. App. 265. . . . *State* v. *Moore*, 49 Conn. App. 13, 21–22, 713 A.2d 859 (1998).

"When relevant evidence of other crimes is offered, the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling upon its admissibility. . . . *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983). Because of the difficulties inherent in this balancing process, we will uphold the trial court's ruling on the admission of uncharged misconduct evidence unless there is a manifest abuse of discretion or an injustice appears to have been done. Id.; *State* v. *Harris*, [43 Conn. App. 830, 837, 687 A.2d 544 (1996)]. . . . *State* v. *Vega*, 48 Conn. App. 178, 191, 709 A.2d 28 (1998)." (Internal quotation marks omitted.) *State* v. *Greene*, 52 Conn. App. 617, 619–21, 727 A.2d 765, cert. denied, 248 Conn. 922, 733 A.2d 845 (1999).

Here, the assistant state's attorney (state's attorney) presented an offer of proof, outside the presence of the jury, prior to the court's ruling on the evidence. The following exchange took place:

"[State's Attorney]: Miss Davis, on September 30, 1996, in the evening hours, is it true that you made a complaint to the police about a threatening incident?

"A. Yes.

"[Green's Attorney]: Your Honor, I'd object. This is what goes to the heart of our motion in limine number two.

"[State's Attorney]: Which is why we're doing it without the jury being here.

"The Court: Overrule the objection.

"[State's Attorney]: Is that right?

"A. Yes.

\* \* \*

"Q. And do you recall what the address is there?

"A. No.

"Q. Would it refresh your recollection to look at a report talking about it?

"A. Yeah.

"Q. If you could read the first sentence to yourself.

"A. That's her address.

"Q. What address is that?

"A. 202 Hamilton Street.

"Q. And at that occasion did you have the opportunity to see Chase Green?

"A. Yes.

"Q. And you saw [the defendant]?

"A. Yes.

"Q. Ryan Baldwin?

"A. Yes.

"Q. And also [the defendant's] brother, Andre, is that right?

"A. I don't know the other people that was there because they was, they had something on their face.

"Q. But you saw [the defendant], Ryan and Chase?

"A. Yes.

"Q. And did you see them in possession of weapons?

"A. Yes.

"Q. And what weapon did you see Ryan Baldwin in possession of?

"A. I didn't see his weapon because he was behind me.

"Q. And what about [the defendant]?

"A. He was on, I was trying to get in my sister's car and he just, but I saw the gun, it was like a black, like a nine or something like that, it was big.

"Q. And how about Chase, what kind of gun did he have, do you recall?

"A. Them western guns. It was silver and long.

"Q. Would it help refresh your recollection if you looked at this report?

"A. No, because I know what I saw but I don't know the names of the guns. I know one's a nine, I don't know the two long guns that he had or whatever.

"Q. Do you recall telling the police that Chase had a nine millimeter and a revolver?

"A. It could have been. I know it was guns, that's all I know, because I was scared.

"Q. Do you recall telling the police that Chase was carrying a nine millimeter and a revolver?

"A. Did I tell them?

"Q. Yes, do you recall telling them that?

"A. Yeah.

"Q. And what occurred that prompted your complaint to the police?

"A. What do you mean?

"Q. Why did you call the police, why were the police called on that occasion?

"A. Because, because they had me on the ground.

"Q. Who's they?

"A. Charles Green and [the defendant] and they had me on the ground. They was looking for my sister's boyfriend, just say that, they were looking for him. Beano came up to my side, he was like, where big man?

"Q. And Beano is Ryan Baldwin?

"A. Yeah. He said, where big man at? But by him saying big man, he had the gun to my side. And he was like, Chase was like, everybody get on the ground, and I got on the ground and, you know, that was it.

"Q. So, on September 30, 1996, at 202 Hamilton Street you saw Beano, Chase and [the defendant] together?

"A. At that night, yeah, they was together.

"Q. And did you hear them, did you ever hear them make comments about they owned the ghetto?

\* \* \*

"A. He never said it. It somebody else that said it. I don't know who the person is that said it, this is their territory, that's all I know, this is their territory.

"Q. Who did you hear that from?

"A. Whoever was talking. He never said it out of his mouth, but it was said. I don't know which one said it.

"[State's Attorney]: Your Honor, it would be my claim that I would like to offer the fact that on September 30, 1996, that the witness observed both defendants, [Green and Clark], in possession of instrumentalities of the crime alleged in this case some six days before the instant case here in a location in close proximity thereto. Also, the fact that they were with someone the state alleges is a coconspirator in this case. I don't, at this point in time, would not be claiming the activity in which she was held to the ground and so forth and the threats occurred. . . . Certainly, the state is offering this evidence to show that both defendants possessed an article with which the particular crime charged may have been accomplished, which these courts have all said is generally relevant to show that the accused has a means to commit the crime."

After hearing argument from all of the parties, the court stated: "The objections, counsel, are sustained in part, but the court finds that there is relevancy to this witness' testimony that on September 30, 1996, apparently she will testify at approximately 11 or 11:30 p.m. in the area of 202 Hamilton Street, I believe it was her aunt's address, that she saw Chase Green, [the defendant] and Ryan Baldwin together and that Chase Green and [the defendant] each had a nine millimeter weapon."

Thereafter, the witness went on to testify before the jury as follows:

"[State's Attorney]: The state's going to ask you a couple more questions, Miss Davis. I want to ask you specifically about a date in 1996. September 30, 1996,

at about 11:20 in the evening, were you at 202 Hamilton Street?

"A. Yes.

* * *

"Q. Did you see people there at that time?

"A. Yes.

* * *

"Q. Did you see either of the defendants out there?

"A. I didn't see them until like around 11:30.

"Q. Okay, 11:30, and where did you see them?

"A. Out in the street where I was at, on the street.

"Q. And in addition to those two people, [Green] and [the defendant], did you see anybody else?

"A. Yeah, there was more people outside.

"Q. And who were some of the other people that were outside?

"A. My sister's boyfriend, me, his cousin, my sister, my other cousin. We was all outside.

* * *

"Q. Do you recall seeing Beano out there, ma'am?

"A. Yeah, he was out there.

"Q. And he's friends with Chase and—

"A. Yes, [the defendant].

"Q. Is that right?

"A. Yes.

"Q. And did you see . . . Chase and [the defendant] with firearms?

"A. At the time, yeah.

"Q. And what kind of firearms did you see them with?

"A. One had a nine.

"Q. Who had a nine millimeter?

"A. [The defendant] had the nine.

"Q. Okay.

"A. And Chase had, Chase was in the street, he had that long gun and he had like a nine too. I don't know the long gun name.

"Q. So Chase had two guns?

"A. Yeah.

"Q. One of which was a nine?

"A. Yeah.

"Q. And that was on September 30, 1996?

"A. Yes.

"[State's Attorney]: No other questions."

The state argues that Davis' testimony was relevant to show that the defendant had the means to commit the crimes charged. The state further argues that the evidence did not prejudice the defendant. "Evidence indicating that an accused possessed an article with which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime. . . . The state does not have to connect a weapon directly to the defendant and the crime. It is necessary only that the weapon be suitable for the commission of the offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Sivri*, 46 Conn. App. 578, 584, 700 A.2d 96, cert. denied, 243 Conn. 938, 702 A.2d 644 (1997).

Here, the state presented an offer of proof prior to the court's ruling on the evidence at issue. We conclude that the court properly admitted Davis' testimony because it tended to show that the defendant had the tools necessary for committing the crimes charged. Further, the evidence was material to the state's case because it helped the state establish the elements of the crimes charged. Specifically, the evidence established that the defendant had a gun in his possession prior to the crime that was the same type of gun used in the commission of the crime. From this evidence, the jury logically could have concluded that the defendant used the same gun that Davis previously saw him with to commit the crime. Finally, the court recognized the possibility of prejudice to the defendant and properly weighed the probative value of the evidence versus its prejudice to the defendant. The court minimized that prejudice by limiting the state's inquiry to the solicitation of evidence regarding the defendant's possession of a firearm. The court did not allow extraneous prejudicial material into evidence such as the fact that the defendant allegedly held the witness' head to the ground during the encounter. Accordingly, we conclude that the court did not abuse its discretion by admitting Davis' testimony that, approximately one week prior to the incident, she witnessed the defendant in possession of a firearm similar to the one that he had in his possession on the night of the shooting.

## II

The defendant next claims that the court improperly allowed the state to exercise a peremptory challenge against a prospective juror, who was a member of the defendant's racial group, without a racially neutral explanation reasonably related to the issues in the case. The defendant argues that the court's action violated his rights under the Connecticut constitution and the

United States constitution.[6] In response, the state argues that the court did not abuse its discretion when it found that the state provided a valid, race neutral explanation for excluding the prospective juror and that the defendant waived his right to challenge the state's reason for excluding the juror when the defendant failed to make an attempt to demonstrate that the state's reason was pretextual.[7]

The following facts are necessary to our resolution of this claim. During voir dire of T, an African-American woman, the state's attorney questioned T about her understanding of proof beyond a reasonable doubt. After a discussion about the standard, the state's attorney exercised a peremptory challenge to strike T from the jury panel.[8] The defendant objected pursuant to

---

[6] The defendant claims that the court's action violated his rights under the constitution of Connecticut, article first, §§ 8, 19, as amended by article fourth of the amendments, and § 20, as well as his rights under the fourteenth amendment to the United States constitution.

[7] The state further argues that the defendant failed to support his claims with independent analysis under the Connecticut constitution. Because we agree with the state, we will address the defendant's claims under the federal constitution only. See *State* v. *Robertson*, 254 Conn. 739, 743 n.5, 760 A.2d 82 (2000) ("[i]n the absence of an independent state constitutional analysis, we limit our review to the defendant's federal constitutional claim").

[8] The relevant portion of the record reveals the following discussion between T and the state's attorney:

"[State's Attorney]: Now, the burden of proof in a criminal case is something called proof beyond a reasonable doubt. Have you heard that term before?

"[T]: Yes.

"[State's Attorney]: That's one of the things the judge will explain to you at the end of the case if you're selected. If the judge tells you that proof beyond a reasonable doubt is not the same thing as proof beyond any and all doubt or any possible doubt. It doesn't go as far as that. Do you have any problem accepting that if the judge tells you that?

"[T]: Could you please repeat the question?

"[State's Attorney]: Sure. The judge, at the end of the case is going to explain to you what is meant by the term, proof beyond a reasonable doubt.

"[T]: Okay.

"[State's Attorney]: As a part of that explanation about what proof beyond a reasonable doubt means, he tells you what it does not mean. He tells you it does not mean, that it's not the same thing as proof beyond any and all

*Batson* and *Holloway,*[9] and the court instructed the state's attorney to articulate his reasons for exercising the challenge. In response, the state's attorney

doubt or any possible doubt, that proof beyond a reasonable doubt is less than that, than those two things. Would you have any problem accepting that?

"[T]: Yes.

"[State's Attorney]: You would?

"[T]: Yes.

"[State's Attorney]: Okay. Tell me why.

"[T]: Because it's proof beyond a reasonable doubt, that's what I've always been taught, that everyone is innocent until proven guilty.

"[State's Attorney]: Okay?

"[T]: So, why would he tell me anything less?

"[State's Attorney]: Maybe I'm not—I'll make sure I'm not misstating—misstating it. The judge will tell you—

"[T]: Uh-hum.

"[State's Attorney]:—that the state has to prove guilt beyond a reasonable doubt.

"[T]: Yes.

"[State's Attorney]: That's—that's right. But proof beyond a reasonable doubt, the judge is going to tell you, does not mean the same thing as proof beyond any and all doubt—

"[T]: Okay.

"[State's Attorney]:—or any possible doubt. It's something less than those things.

"[T]: Right.

"[State's Attorney]: Is that—Do you have any problem with accepting that?

"[T]: Oh, in that case, no. I don't have a problem accepting that.

"[State's Attorney]: All right. I as the state's attorney don't have to be concerned that you're going to, you know, make me prove something that the law does not require. You're not going to make me prove this case beyond any and all doubt or any possible doubt, is that fair to say or not fair to say?

"[T]: Isn't that your job?

"[State's Attorney]: To prove guilt beyond any possible doubt?

"[T]: Beyond a reasonable doubt.

"[State's Attorney]: Right. Are you going to make me prove something more than that though is what I'm asking you?

"[T]: No.

"[State's Attorney]: All right. Thank you, ma'am."

[9] "Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. See, e.g., *Hernandez*

explained that T's responses indicated to him that she did not appear to understand his questions or that she did not perceive him as being clear. The state's attorney further stated that he had some concerns with the manner in which she responded to him, and whether she could understand and follow the court's instructions and not hold the state to a higher burden of proof than required by the law. The court accepted the state's explanation as sufficient. The defendant did not object or make any further attempt to establish that the state excused T on the basis of a pretextual explanation.

"In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986),] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge

v. *New York*, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, [476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)]. Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination. *State* v. *Holloway*, 209 Conn. 636, 646 & n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Thus, in this state, after the party contesting the use of the peremptory challenge has raised a *Batson* claim, the party exercising the challenge must proffer a race neutral explanation for its decision to strike the venireperson from the jury array. Id., 646. In Connecticut, therefore, the party objecting to the exercise of the peremptory challenge satisfies step one of the tripartite process simply by raising the objection." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 658 n.18, 735 A.2d 267 (1999).

potential jurors solely on account of their race . . . . *State* v. *Robinson*, [237 Conn. 238, 243–44, 676 A.2d 384 (1996)]. Relying on the rationale underlying *Batson*, the United States Supreme Court has held that gender-based challenges also are impermissible. *J.E.B.* v. *Alabama ex rel. T.B.*, [511 U.S. 127, 146, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994)].

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply

to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . *United States* v. *Alvarado*, [951 F.2d 22, 26 (2d Cir. 1991)]. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. *Hernandez* v. *New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *United States* v. *Alvarado*, supra, 951 F.2d 25; *State* v. *Gonzalez*, [206 Conn. 391, 395, 538 A.2d 210 (1988)]. Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. *State* v. *Hinton*, [227 Conn. 301, 323–24, 630 A.2d 593 (1993)]; see *State* v. *Gonzalez*, supra, 406–407. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to

support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 657–60, 735 A.2d 267 (1999).

Here, T's responses to the prosecutor's questions, coupled with the manner in which she responded to him, support the prosecutor's reasons for striking the prospective juror. "A prosecutor, when exercising a peremptory challenge to remove a venireperson, may legitimately [base that decision] not only on answers given by the prospective juror to questions posed on voir dire, but also on the prosecutor's observations of the prospective juror. An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge. . . . Thus, a prosecutor's explanation that a venireperson was excluded because he or she seemed, for example, inattentive or hostile to the government, if credible, is sufficient." (Internal quotation marks omitted.) *State* v. *Robinson*, supra, 237 Conn. 238, 254–55 n.15.

Moreover, the defendant did not attempt to establish that the state gave a pretextual reason for excusing T. "Once the state met its burden of producing a race-neutral explanation, it was incumbent upon the defendant to persuade the trial court that the state's reasons were insufficient or pretextual. To have done so, the defendant could have advanced reasons that are salient to a showing of pretext. . . . *State* v. *Beltran*, 246 Conn. 268, 280, 717 A.2d 168 (1998). The defendant's failure to provide the trial court with such reasons may be treated as acquiescence in the validity of the prosecutor's explanation. Id.; see also *United States* v. *Arce*, 997 F.2d 1123, 1126–27 (5th Cir. 1993); *United States* v. *Rudas*, 905 F.2d 38, 41 (2d Cir. 1990)." (Internal quotation marks omitted.) *State* v. *King*, supra, 249 Conn.

662–63. In the present case, the defendant failed to meet his burden of establishing that the state's reasons for excluding T were pretextual. Accordingly, we conclude that the court did not abuse its discretion in allowing the prosecutor to exercise a peremptory challenge against T.

### III

Finally, the defendant claims that the court improperly instructed the jury that it could not consider what effect, if any, a state witness' use of marijuana on the night of the shooting had on his ability to see and comprehend the events surrounding the shooting. Specifically, the defendant argues that the court's instruction to disregard this evidence violated his constitutional right to confront witnesses and to have the jury evaluate the credibility of witnesses on the basis of properly admitted evidence. We disagree.

The following additional facts and procedural history are necessary for our resolution of this issue. At trial, the state presented the testimony of its key witness, Townsend, who identified the defendant as being present at the scene of the crime and in possession of a pistol. Townsend testified that he did not come forward with his story until officers from the New Haven police department stopped and incarcerated him for a traffic violation. The defendant cross-examined Townsend regarding his drug use, inquiring whether he had smoked marijuana or ingested any cocaine on the night of the shooting. Townsend acknowledged that he had smoked marijuana, but denied using any cocaine on that night. The defendant further cross-examined Townsend regarding inconsistencies in his story as to where the shooting occurred. Townsend admitted that although he previously had stated that he observed Jenkins get shot, he actually did not witness the shooting because he ran from the scene as soon as the shots were fired.

The defendant extensively cross-examined Townsend, however, he did not inquire into the effect that the marijuana had on Townsend's ability to see or comprehend the events on the night of the shooting.[10]

In its instructions to the jury regarding the credibility of witnesses, the court stated: "The credibility of witnesses and the weight to be given to their testimony are matters which are your function to determine. However, I may properly make certain suggestions to you. No fact is, of course, to be determined merely by the number of witnesses testifying for or against it. It is the quality, not quantity, of testimony which controls. In weighing the testimony of a witness, you should try to size him or her up. You should have in mind all those little circumstances which point to his or her truthfulness or untruthfulness. You should consider any possible bias or prejudice he or she may have whether for or against the state or a defendant, his or her interest or lack of interest of whatever sort in the outcome of the trial, his or her ability to observe facts correctly and to remember and relate them tru[thfully] and accurately. You should test the evidence he or she gives you by your knowledge of human nature and the motives which influence and control human action. If any facts are admitted or otherwise proved to you, you may bring them into relation with his or her testimony and see if they fit together with it. In short, you are to bring to bear upon it the same considerations and use the same sound judgment you apply to questions of truth and veracity which are daily presenting themselves for your decision in the ordinary affairs of life. Any conduct or statement of a witness which you find inconsistent with any other conduct or statement of that witness you may consider in weighing the credibility of that witness."

[10] The codefendant, Green, also did not inquire into the effect of marijuana on the witness.

Regarding identification evidence, the court instructed the jury as follows: "Identification is a question of fact for you to decide taking into consideration all of the evidence that you have seen and heard in the course of the trial. The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crimes charged. The identification of a defendant by a single witness as the one who committed the crime is in and of itself sufficient to justify a conviction of such a person provided, of course, that you are satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime. In arriving at a determination as to the matter of identification, you should consider all of the facts and circumstances that existed at the time of the observation of the perpetrator by the witness. In this regard, the credibility and the reliability of the witness is of paramount importance since identification testimony is an expression of belief or impression by the witness. Its value depends upon the opportunity and ability of the witness to observe the offender at the time of the event and to make an accurate identification later. It is for you to decide how much weight to place upon such testimony.

"In appraising the testimony given by a witness identifying a defendant as a perpetrator of the crimes charged, you should take into account whether the witness had adequate opportunity and ability to observe the perpetrator on the date in question. This may be affected by such circumstances as the length of time available to make the observation, the distance between the witness and the perpetrator, the lighting conditions at the time of the events, whether the witness had known or seen the person in the past and whether anything distracted the attention of the witness during the incident. You should also consider the witness' physical and emotional condition at the time of the incident and the

witness' powers of observation in general. In short, you must consider the totality of the circumstances affecting the identification."

With regard to Townsend's testimony, the court instructed the jury: "In weighing the credibility of [Leroy] Townsend, you may consider the fact that he was convicted of one felony in 1986 and two felonies in 1994, and give such weight to those facts which you decide is fair and reasonable in weighing the credibility of his testimony in court and the statement he gave to the police which is taped and marked as exhibit 50A. Also, in weighing the credibility of [Leroy] Townsend, you may consider the testimony of . . . Sherry Heyward concerning her opinion that . . . Townsend is a pathological liar and give such weight to that opinion which you decide is fair and reasonable in weighing his credibility." Nevertheless, earlier in its charge to the jury, the court stated: "[Y]ou have heard testimony that [Leroy] Townsend smoked marijuana the night of the shooting. There is no evidence as to what effect it had on him. Because there is no such evidence, you must not speculate that he was or was not affected by it or how he was affected by it."

At the close of the court's instruction to the jury, the defendant objected to the court's statement regarding how the jury must consider the evidence of Townsend's marijuana usage. The court declined to reinstruct the jury. We review this claim because the defendant properly preserved it.

"Our standard of review on this [nonconstitutional] claim is whether it is reasonably probable that the jury was misled. . . . The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules

of law. . . . Therefore, jury instructions need not be exhaustive, perfect, or technically accurate. Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Internal quotation marks omitted.) *State* v. *Taft*, 57 Conn. App. 19, 29, 746 A.2d 813, cert. granted on other grounds, 253 Conn. 909, 753 A.2d 942 (2000).

The defendant argues that the court's instruction that the jury must not speculate as to how Townsend's marijuana usage affected him violated the defendant's right to confrontation. As a threshold matter, we note that although the defendant has framed this claim in terms of a denial of his right to confrontation and his due process right to a fair trial, the claim does not present constitutional issues. Instead, the claim presents evidentiary issues related to the court's instructions to the jury. "Clearly, the defendant has put a constitutional tag on . . . nonconstitutional evidentiary ruling[s]. *State* v. *Douglas*, 203 Conn. 445, 455, 525 A.2d 101 (1987) . . . . *State* v. *Vilalastra*, [207 Conn. 35, 46, 540 A.2d 42 (1988)]; *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985); *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982). *State* v. *Walker*, 215 Conn. 1, 5, 574 A.2d 188 (1990)." (Internal quotation marks omitted.) *State* v. *Person*, 215 Conn. 653, 659, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991). "Just as every claim of evidentiary error by the trial court is not truly constitutional in nature; see, e.g., [*State* v. *Golding*, 213 Conn. 233, 241, 567 A.2d 823 (1989)]; every claim of instructional error is not truly constitutional in nature. We have recognized, for example, that claimed instructional errors regarding the elements of an offense; see, e.g., *State* v. *Boles*, 223 Conn. 535, 543, 613 A.2d 770 (1992); and claimed instructional errors regarding the burden of proof or the presumption of innocence; see, e.g., *State* v. *Adams*, 225

Conn. 270, 289, 623 A.2d 42 (1993); are constitutional in nature . . . . We have also recognized, however, that claimed instructional errors regarding general principles of credibility of witnesses are not constitutional in nature. *State* v. *Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991). Indeed, it would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party because of a strained connection between it and a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Dash*, 242 Conn. 143, 151–52, 698 A.2d 297 (1997).

" 'The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Jarzbek*, 204 Conn. 683, 707, 529 A.2d 1245 (1987) [cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988)]; *State* v. *Reardon*, 172 Conn. 593, 599–600, 376 A.2d 65 (1977). It is expressly protected by the sixth and fourteenth amendments to the United States constitution; *Davis* v. *Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Pointer* v. *Texas*, supra [403]; and by article first, § 8, of the Connecticut constitution. *State* v. *Torello*, 103 Conn. 511, 513, 131 A. 429 (1925).' *State* v. *Hufford*, 205 Conn. 386, 400–401, 533 A.2d 866 (1987). 'The right of *physical* confrontation is a . . . fundamental component of the [federal and state confrontation] clauses' . . . *State* v. *Jarzbek*, supra, 692; and guarantees an accused 'the right to be present in the courtroom at every stage of his trial.' *Illinois* v. *Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)." (Emphasis in original.) *State* v. *Cassidy*, 236 Conn. 112, 122, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled on other grounds, *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000).

"The defendant is entitled fully and fairly to confront and cross-examine the witnesses against him. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; *Davis* v. *Alaska*, [supra, 415 U.S. 318];[11] *State* v. *Maldonado*, 193 Conn. 350, 356, 478 A.2d 581 (1984). The primary interest secured by the right of confrontation is the right to cross-examine witnesses. *State* v. *Barrett*, 43 Conn. App. 667, 675, 685 A.2d 677 (1996), cert. denied, 240 Conn. 923, 692 A.2d 819 (1997). The defendant does have a right under the confrontation clause to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, [can] appropriately draw inferences relating to the reliability of the [state's] witness. *Davis* v. *Alaska*, supra, 318; *State* v. *Ouellette*, 190 Conn. 84, 101, 459 A.2d 1005 (1983). The confrontation clause requires that [if] the testimony of such a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to discover any infirmities that may cast serious doubt upon its truthfulness. . . . *State* v. *Morant*, 242 Conn. 666, 682, 701 A.2d 1 (1997). The right of cross-examination is not, however, absolute. *State* v. *Talton*, 197 Conn. 280, 284, 497 A.2d 35 (1985); *State* v. *Cooke*, 42 Conn. App. 790, 794, 682 A.2d 513 (1996). . . . [A] defendant's right of [cross-examination] is not infringed if the defendant fails to pursue a line of inquiry open to him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was

---

[11] We respectfully disagree with the dissent that our resolution of this appeal violates *Davis* v. *Alaska*, supra, 415 U.S. 308. In *Davis*, the trial court granted the state's motion in limine preventing the defendant from cross-examining a juvenile witness about his criminal record. The *Davis* defendant, therefore, was denied his constitutional right to confront the witness by challenging his credibility. Here, the defendant's cross-examination of the witness was not limited, except by the defendant's own failure to ask the witness about his ability to perceive and to relate events after he had smoked five marijuana cigarettes. Because there was no evidence before the jury concerning the witness' ability to perceive and to relate, the court simply instructed the jurors that they could not speculate about those issues.

made. . . . *State* v. *Bruno*, 236 Conn. 514, 533, 673 A.2d 1117 (1996); see *State* v. *Morant*, supra, [684]." (Internal quotation marks omitted.) *State* v. *Jones*, 50 Conn. App. 338, 360–61, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999).

In support of his position, the defendant argues that the situation in the present case is analogous to *State* v. *Heinz*, 3 Conn. App. 80, 86, 485 A.2d 1321 (1984), in which this court stated: "The jury may, without the aid of expert testimony, use the consumption of alcohol as a basis on which to infer impairment of ability to observe and recall accurately." Nevertheless, the situation in *Heinz* is distinguishable from the present case, not because of the particular drug used by the witness, in that case alcohol and here marijuana, but rather because of the restrictions that the trial court in *Heinz* placed on the defendant's ability to cross-examine the witness in that case.

In *Heinz*, the trial court allowed the defendant to cross-examine two witnesses regarding the fact that they had consumed several beers on the night that they had made their observations. The trial court, however, precluded the defendant from cross-examining the witnesses regarding "the effect of this consumption of alcohol on their abilities to recall what they observed that night." Id., 84–85. In that case, we stated that "[t]he confrontation clause does not require that the defendant be permitted also to elicit from the officers the opinion that consumption of alcohol during and after observing something can affect one's ability accurately to observe and later recall what one observed." Id., 86. Nevertheless, we held that the trial court in *Heinz* abused its discretion by setting a limit on the defendant's ability to cross-examine the witnesses on the issue of credibility as it related to their ability to observe and recall accurately the details of their observations. Id., 87–89.

The situation in *Heinz* is therefore inapposite to the situation in the present case because here the record does not reflect, nor does the defendant claim, that the court placed any restrictions on his ability to cross-examine Townsend on the issue of his marijuana usage or its effect on him. Rather, the defendant argues that the court's instruction to the jury not to speculate as to the effect of Townsend's marijuana usage improperly impaired the defendant's right to confrontation by precluding the jury from considering a matter that was brought before it by the mere fact that the record contained evidence that Townsend used marijuana prior to making his observations. Although the defendant had an opportunity to cross-examine Townsend on the issue of whether the marijuana affected his ability to observe the events on the night of the shooting, the defendant failed to make full use of that opportunity. Accordingly, the court's instruction not to speculate as to the effect of marijuana usage on Townsend did not deprive the defendant of his constitutional right to confrontation.[12]

[12] The dissent opines that the court denied "the jury, as the sole trier of fact and credibility, the right to consider facts from which they could draw inferences about the reliability and credibility of the witness." The court did no such thing. It did not tell the jury to disregard Townsend's testimony that he had smoked five marijuana cigarettes. The jury, therefore, was free to draw whatever conclusions it wanted with respect to the character of a witness who had ingested an illegal substance. The court merely pointed out that the jury could not speculate about the effect smoking five marijuana cigarettes had on Townsend.

Although we find that the issue raised by the dissent regarding the effects of marijuana is irrelevant to our resolution of this appeal, we find disturbing the dissent's position that the effects of using marijuana are common knowledge among jurors. First, we note that consuming alcohol by persons of the age of majority is a legal act; see General Statutes § 30-89; whereas smoking marijuana, unless otherwise provided for by law, is not a legal act. General Statutes § 21a-277 (b). Second, we cannot agree with the dissent's implication that all jurors are familiar with the effects of marijuana because such an implication ignores the breadth and diversity of our jury pool.

We also take issue with the dissent's position that *State* v. *Person*, supra, 215 Conn. 653, stands for the proposition that our Supreme Court endorsed the practice of inviting the jury to draw inferences from a witness' marijuana use. First, the claims in *Person* concerned prosecutorial misconduct, specifi-

The defendant in the present case made a tactical decision not to ask the witness what effect the marijuana had on him. The court did not improperly instruct the jury that it could not speculate as to the effect of the marijuana on Townsend because no party introduced evidence as to what effect, if any, the marijuana had on the witness. Indeed, it is well established that "[e]vidence of a witness' mental condition may be admitted if the defendant establishes that a relationship exists between the condition and the [witness'] capacity to observe, remember and narrate the relevant facts. *State* v. *Cardinal*, 194 Conn. 114, 118–19, 478 A.2d 610 (1996). Absent such a showing, evidence of the condition . . . may be excluded as irrelevant." *State* v. *Smith*, 42 Conn. App. 41, 58, 680 A.2d 1340 (1996). "The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. If *as a result of a mental condition* such capacity has been substantially diminished, evidence of that condition before, at and after the occurrence and at the time of trial, is ordinarily admissible for use by the trier in passing on the credibility of the witness. . . . Thus, in

cally, whether a prosecutor could "attempt to impeach a witness during cross-examination through use of that witness' prior invocation of his fifth amendment privilege . . . ." Id., 659–60. Second, the cross-examination of the witness in *Person* went to the issue of the witness' ability to perceive and relate after he had used marijuana. Our Supreme Court agreed with the trial court that the witness' use of marijuana was relevant to the question of his ability to perceive and relate, and, therefore, the question was proper. See id., 661. The critical and distinguishing fact here is that the defendant did not ask any questions about Townsend's ability to perceive or to relate.

The dissent implies that the court required, as a predicate, that the jury be instructed by an expert witness on the effects of marijuana on the witness' ability to perceive and recall events. The issue of expert testimony was never before the court. Indeed, the court never mentions it. Therefore, the court properly refused to allow the jury to speculate on something not before it as evidence. The jurors knew that the witness had smoked five marijuana cigarettes and that it was their function to evaluate his credibility, but they could not speculate as to what effect the use of marijuana had on the witness' ability to observe and to recall events because that was not in evidence.

order for evidence of a witness' psychiatric condition to be admissible for impeachment purposes, there must be a showing that the condition substantially affected the witness' ability to observe, recall or narrate events at issue in the trial." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Cardinal,* supra, 118–19. Similarly, in the present case, the defendant did not attempt to show that the witness' condition after smoking marijuana affected the witness' ability to observe, to recall or to narrate events at issue in the present case. Absent such an attempt or showing, we conclude that, under the circumstances of this case, the court properly instructed the jury that it could not speculate as to the effect that the marijuana had on Townsend, and, therefore, we conclude that there is no reasonable possibility that the court's instruction misled the jury.

The judgment is affirmed.

In this opinion LANDAU, J., concurred.

LAVERY, C. J., dissenting. The majority's opinion is clearly contrary to the United States Supreme Court's holding in *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), when the majority upholds the trial court's charge that the jury could not consider the effect of marijuana use on the state's key witness, the only witness who identified the defendant as being at the scene with a gun. By so doing, the majority denies the jury, as the sole trier of fact and credibility, the right to consider facts from which it could draw inferences about the reliability and credibility of the witness. Thus, while I agree with the majority's conclusions as to the other issues raised in this appeal, I respectfully dissent from its conclusion that the trial court's instruction[1] that the jury could not consider the effect on

---

[1] The relevant portion of the court's instruction is as follows: "Also, you have heard testimony that [Leroy] Townsend smoked marijuana the night of the shooting. There is no evidence as to what effect it had on him. Because there is no such evidence, you must not speculate that he was or was not

the state's key witness of the witness' smoking of five marijuana joints shortly before the shooting constituted harmless error.

As an initial matter, the majority addresses the claim here as a "nonconstitutional evidentiary" claim. I disagree with this characterization of the defendant's claim since the jury instruction at issue violated his right to confront and to impeach a witness against him, a right guaranteed both by the sixth amendment to the United States constitution and by article first, § 8, of the Connecticut constitution.[2] The majority reasons that not all claims of instructional error are constitutional in nature and cites *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997), for the proposition that "claimed instructional errors regarding *general principles of credibility* of witnesses are not constitutional in nature." (Emphasis added; internal quotation marks omitted.)

While these two propositions put forth by the majority as its basis for dismissing this claim as nonconstitutional are true, they do not prove the point. First, the error claimed here is not about general principles of credibility of witnesses. The error claimed here concerns *one* instruction about the credibility of *one* witness. Second, the fact that not all instructional errors are constitutional in nature does not mean that *this* claim of instructional error is not constitutional in nature.

As the United States Supreme Court stated in *Davis*: "[I]t seems clear . . . that to make any [effort to

affected by it or how he was affected by it." It is undisputed that counsel for the defendant timely objected to this portion of the charge, and the court declined to reinstruct the jury.

[2] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

impeach a witness] effective, defense counsel should [be] permitted to expose to the jury the facts from which jurors, *as the sole triers of fact and credibility*, could appropriately draw inferences relating to the reliability of the witness." (Emphasis added.) *Davis* v. *Alaska*, supra, 415 U.S. 318; see also *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992); *State* v. *Lubesky*, 195 Conn. 475, 482, 488 A.2d 1239 (1985).

This court previously has stated that "a criminal defendant's right to impeach the witnesses against him implicates his constitutional right to confrontation. *State* v. *Rodriguez*, 180 Conn. 382, 393, 429 A.2d 919 (1980). The confrontation clause gives the defendant the right to confront the witnesses against him." *State* v. *Menzies*, 26 Conn. App. 674, 684, 603 A.2d 419, cert. denied, 221 Conn. 924, 608 A.2d 690 (1992).

This court also has stated: "The denial or undue restriction of the right to confrontation constitutes *constitutional error. Davis* v. *Alaska*, [supra, 415 U.S. 318]; *State* v. *Ouellette*, 190 Conn. 84, 101, 459 A.2d 1005 (1983)." (Emphasis added.) *State* v. *Streater*, 36 Conn. App. 345, 352, 650 A.2d 632 (1994), cert. denied, 232 Conn. 908, 653 A.2d 195 (1995); see also *State* v. *Lee*, 229 Conn. 60, 70, 640 A.2d 553 (1994).

Because the defendant elected a jury trial, he had a right to have all questions of fact decided by the jury, which courts have often referred to as "the sole triers of fact and credibility . . . ." *Davis* v. *Alaska*, supra, 415 U.S. 318; *State* v. *Santiago*, supra, 224 Conn. 331; *State* v. *Jones*, 60 Conn. App. 866, 869, 761 A.2d 789 (2000), cert. denied, 255 Conn. 942, 769 A.2d 59 (2001). In its capacity as the trier of fact, the jury "is the judge of the credibility of all the witnesses and the weight to be given their testimony and, therefore, has the right to accept part or disregard part of a witness' testimony." (Internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 197, 208, 763 A.2d 45 (2000).

This court previously has stated that the effect of alcohol consumption on a witness' ability accurately to observe and later to recall what he observed "is an effect which is common knowledge and is an inference which is clearly within the ability of the jurors, as laypersons, to draw based on their own common knowledge and experience. The jury may, without the aid of expert testimony, use the consumption of alcohol as a basis on which to *infer* impairment of ability to observe and recall accurately." (Emphasis added.) *State* v. *Heinz*, 3 Conn. App. 80, 86, 485 A.2d 1321 (1984), citing *D'Amato* v. *Johnston*, 140 Conn. 54, 58, 97 A.2d 893 (1953) (intoxication and its accompaniments are matters of common knowledge).

In addition, the state, on prior occasions, has successfully impeached a witness by inviting the jury to draw inferences from the witness' use of marijuana, a practice our Supreme Court has endorsed. In *State* v. *Person*, 215 Conn. 653, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991), the state's attorney asked questions of a defense witness, Mercier, about his use of marijuana. Justifying this line of questioning, the state's attorney stated: "It's highly relevant. I claim that as highly relevant. He has testified as far as *perceptions of what he observed, what he heard, what he saw, his observations*. And, my point here is that he was not in complete control of his faculties . . . ." (Emphasis added; internal quotation marks omitted.) Id., 661 n.4. The Supreme Court noted that the state "sought to raise doubt as to Mercier's ability to observe and perceive events, an entirely permissible subject . . . ." Id., 661. In addition, the Supreme Court noted in *Person* that "[t]he *prosecutor* may not express his own opinion, either directly or indirectly, as to the credibility of witnesses." (Emphasis added; internal quotation marks omitted.) Id., 666 n.8.

Prior to the Supreme Court's decision in *Person*, this court considered the use of testimony about drug use for impeachment purposes in *State* v. *Person*, 20 Conn. App. 115, 564 A.2d 626 (1989), aff'd, 215 Conn. 653, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991). We stated: "The prosecutor's initial purpose in questioning Mercier regarding his use of marijuana was to impeach his credibility by casting doubt on his ability to perceive and recall the events that were the subject of his testimony. The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. . . . *Consumption of alcohol or drugs obviously can impair an individual's ability to perceive and recall accurately* . . . ." (Citations omitted; emphasis added.) Id., 121–22.

In no case in which the issue of impeaching a witness' credibility by his drug or alcohol use has arisen has either this court or our Supreme Court required, as a predicate, that the jury be instructed by an expert witness on the effects of the alcohol or drug use on the witness' ability to perceive and recall events. This has been true whether the "drug" in question was alcohol, marijuana or cocaine.

There have been a number of cases in which both this court and our Supreme Court have held that ordinary people, namely, jurors, can judge for themselves whether a witness' admitted use of drugs would, in their opinion, affect the witness' credibility. "The trier of fact *need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters.*" (Emphasis added.) *Way* v. *Pavent*, 179 Conn. 377, 380, 426 A.2d 780 (1979). In *Way*, the plaintiff had consumed ten glasses of beer and, without any expert testimony, the Supreme Court approved of permitting the jury to draw its own infer-

ences on the effects of that quantity of alcohol, finding it to be a "[matter] of common knowledge . . . ." Id.

If, in 1979, the effects of ten ten-ounce glasses of beer were common knowledge, then it is fair to say that in 2000, the effects of several marijuana cigarettes are common knowledge. In fact, in 1993, this court approved of a statement by a trial court to a jury that "the effect of alcohol on a person and also the effect of marijuana on a person . . . [are] probably within your common knowledge, but [defense counsel] has asked me to allow this to be presented as an exhibit so that he could argue from this what he feels the [marijuana] and alcohol, what role they played in this case. So . . . it's offered solely for the purpose of explaining to you *something you already know, the effect of marijuana* . . . on a person." (Emphasis added.) *State* v. *Charlton*, 30 Conn. App. 359, 368–69 n.9, 620 A.2d 1297, cert. denied, 225 Conn. 922, 625 A.2d 824 (1993).

I would therefore conclude that it was improper for the trial court to instruct the jury not to draw any conclusions in the absence of testimony, expert or otherwise, as to the probable effects of the witness' smoking of five joints of marijuana on the night of the shooting on his ability to perceive and to recall the events accurately. Because the instruction precluded the jury from considering important facts bearing on the credibility of the only witness[3] who had placed the defendant at the scene and with a gun, I would find that the instruction was not harmless and reverse the judgment and remand the case for a new trial.

[3] The witness' credibility was the key factor in the trial. He was impeached with prior felonies and inconsistent statements. He came forward as a witness three weeks after the incident, when he was incarcerated. Further, the witness' own cousin testified that he was a pathological liar.